**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jawdat Abdel RAHMAN, Defendant–**
**Appellant.**

No. 92–3478.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1994.

Decided Sept. 13, 1994.

Barry R. Elden, Asst. U.S. Atty., Debra Bonamici (argued), Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Cynthia Giacchetti, Chicago, IL (argued), for defendant-appellant.

Before CUDAHY, COFFEY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The defendant, Jawdat Abdel Rahman is a 65–year old Arab immigrant who was born in (what was then) Palestine. He became a naturalized citizen in 1988. Rahman has owned or operated a number of stores on the south side of Chicago since then. He speaks mainly Arabic and indicates that he has a slight understanding of English. When Rahman learned that his son and son-in-law had been "ripped off" by a friend named Yousef Haik in a deal involving hijacked Christmas merchandise, Rahman demonstrated considerable verbal outrage. His vehement public comments regarding Haik (such as threatening to "pull his hair from his beard") ultimately came to the attention of the FBI. Rahman was contacted by an undercover agent posing as a "hit man." As a result of Rahman's conduct recounted below, he was charged with soliciting a violent felony, attempted extortion and robbery. We now address his appeal of his conviction on all three charges.

## FACTUAL BACKGROUND

### The Merchandise

On November 15, 1991, a truck driver was assigned to transport a trailer load of House of Lloyd Christmas novelties between the Burlington Northern Railroad yard and the Conrail Railroad yard in Chicago. The driver picked up the load, but never delivered it. Instead, he sold the load to Nashat Rahman ("Nashat") and Ahmad Mohammed, the defendant Jawdat Rahman's son and son-in-law. After Nashat and Mohammed had unloaded the merchandise, the driver abandoned the trailer in the parking lot of a Sears store.

Nashat and Mohammed brought their trailer of merchandise to their friend, Yousef Haik, the owner of a grocery store. Mohammed asked Haik to take a share of the load, and to help store it. Haik, who was planning to relocate his business to Cincinnati, agreed to allow Nashat and Mohammed to store the load in a bakery space he had rented across the street from his grocery.

The load became an albatross. Nashat and Mohammed tried to sell the entire load to a man from Detroit, but the deal fell through. At the end of November, Mohammed suggested that Haik take the load to Cincinnati, open a store, and attempt to sell the goods there. Haik agreed, for a one-third share of the profit. Mohammed gave Haik $1600 cash to transport the load to Cincinnati and rent a store.

The Christmas novelties did not sell well. By the end of December, Haik had only sold $1200–$1500 worth of the merchandise. Finally, Haik rented a storage locker in Cincinnati, and stored the unsold goods there. He did not contact Nashat or Mohammed to tell them about the storage, nor did he give them any of the money from the sales. In fact, Nashat and Mohammed did not hear from Haik again.

Meanwhile, Nashat and Mohammed were working at the Windy City Food and Liquor store, which Rahman owned. Nashat and Mohammed ran the store, and paid rent to

Rahman each month. In the first week of December 1991, Rahman came to the store to collect his rent. Nashat and Mohammed were unable to pay Rahman because they had spent their rent money on the Christmas novelties. Nashat assured Rahman he would have the rent in three or four days. When Rahman later returned for the rent, Nashat and Mohammed still could not pay, and they were forced to explain to Rahman what had happened with Haik, the merchandise, and their money. Rahman was outraged. Nashat testified at trial that Rahman threatened to disown him, kill him, and fire him from his job.

**FBI Informant Mahmoud Samara**

In mid-January 1992, Rahman was still ranting about the incident. Mahmoud Samara, a friend of Mohammed's, came to the Windy City Food & Liquor store to sell baby formula. As Samara walked into the store, he overheard Rahman speaking loudly to Nashat, Mohammed, and a third person, about Yousef Haik. Samara heard Rahman say that he was "going to finish Yousef," "going to pull his hair from his beard," and "let his kids live without their father." Mohammed went behind the cash register to meet Samara, and rebuked Rahman, saying, "you want to tell the story for everybody?" Rahman then calmed down.

Samara asked if anyone wanted to purchase milk. Rahman asked Samara where he got the milk, and Samara responded that he got it in Ohio. Upon hearing this, Rahman called Samara "son," poured him coffee, and proceeded to tell Samara that he, Nashat and Mohammed had bought a trailer load of merchandise and stored it at Haik's place in Ohio. He gave Samara Haik's address and offered him $5,000 to locate Haik, and report back to him. Rahman told Samara that after Samara had reported on Haik, Rahman would himself go to Ohio and "put a bullet in [Haik's] head."

Samara wanted to earn the money, so he went to Ohio to look for Haik. What Rah-

man did not know, however, was that Samara was also a government informant.[1] At trial, Samara testified that he intended to find Haik, report to Rahman, collect the money, then turn Rahman in to the FBI. Samara went to Ohio, but was unable to locate Haik.

Upon Samara's return to Chicago, he called the FBI and told an agent the story of how defendant had told him about the trailer of merchandise, made death threats against Haik, then offered him money to find Haik in Ohio. On February 5, 1992, FBI agents sent Samara to Windy City Food & Liquor equipped with a recording device. The agents had instructed Samara to tell Rahman that Samara's wife's cousin was a Mafia hit man, and to offer to introduce Rahman to the hit man.

Samara entered the store and spoke to Rahman. According to the transcript of their conversation, translated from Arabic, Samara told Rahman that he had been in Ohio, and that Haik was rumored to be in Michigan. Samara said that he could obtain Haik's new address in a week. Rahman said, "Finish him off completely and, I don't want any money."

Samara then told Rahman that his wife's cousin worked with the Mafia. Samara explained, "This guy will get you rights [meaning, your share of the merchandise], he will kill him completely." He then asked, "Do you want me to bring him, so that you can meet him?" Rahman agreed.

Rahman told Samara that this cousin could have a third of the merchandise if he could secure Rahman's "rights." Samara said, "By God he will come here just like a shoe because he had ripped off some people," to which Rahman replied, "Many, what do I have with other people, all I want is what is rightfully mine. I just want my entitlement."

At the end of the conversation, Samara said, "O.K., I have to go now, I'll pass by the day after tomorrow with the young man and have you meet him and you can talk to him,

---

1. In 1991, Samara confessed to the FBI that he had counterfeited audio tapes, counterfeited money, and failed to file income tax returns since his arrival in the United States in 1988. At the time of his testimony, Samara was scheduled to

plead guilty to selling counterfeit tapes pursuant to a plea agreement in which he would cooperate with the government. He had not yet been charged for the other two offenses to which he confessed.

O.K.? ... And you see what he tells you." Rahman said, "But I want to know where the man is." Samara asked, "Do you want him to finish him off?" Rahman replied, "After I get my rights he can finish him off completely.... And he can have an extra $5,000."

### FBI "Hit Man" meets with Rahman

A week later, on February 12, 1992, Samara visited Rahman with FBI Special Agent Henke, who was posing as a hit man named Don. Henke wore a recording device. The February 12 recording was partly in Arabic and partly in English—Rahman spoke to Henke in rudimentary English, but to others in Arabic. Samara introduced Henke as "the guy who will look for" and "find" Haik. Rahman immediately began to blurt out his predicament with the trailer of merchandise to Henke.

Rahman proposed to Henke:

I wanna pay nothing okay. If you get it this guy, okay, get it the merchandise okay from him the money, okay, I give you, if you take thirty thousand dollars, I give you ten thousand dollars.... If you get nothing ...

At which point, Henke interrupted, "I kill people for a living. Now [Samara] here tells me you want somebody dead, is that right? Yes or no?" Rahman responded, "Uh huh yes." Moments later, Samara explained to Rahman in Arabic, "If this guy says that he'll get him for you, then he will." Rahman said, "What do I need with him? All I want is my money." Then Rahman added, "Now if he brings his head, what am I going to gain? I want my rights, he cheated me, he can have the third, a third of the amount that he retrieves...."

The remainder of the conversation continued in a similar fashion, with Henke repeatedly trying to propose murder or violence, and Rahman responding with non sequitur statements regarding the market value of the goods or what percentage Henke would get if he retrieved the merchandise.

Henke told Rahman that he charged $5,000 for his services, $2,500 of which would have to be paid up front. Rahman responded, "I tell they uh, Mahmoud ... okay, that trailer he take the trailer, you know that...."

I don't wanna want this guy die right now, I want the money. If he get it the money, fifty thousand, take sixteen, seventeen thousand. If you get it thirty thousand, get it ten thousand." Confused, Henke proclaimed, "Oh I'm not, I'm not a bill collector." He then asked Rahman to clarify whether he wanted Haik murdered or his legs broken. Rahman answered, "I don't want no one to kill him, I want the money."

Again, Henke later said to Rahman, "the reason I'm here is, he told me you wanted somebody dead." Rahman retorted, "No I don't no one dead, yet." Henke asked Rahman two more times whether Rahman wanted him to kill Haik. Each time, Rahman emphatically responded that he did not, but that Henke could keep one-third of whatever he recovered.

Henke, however, still was not finished trying to solicit Rahman. He asked Rahman, "how do you expect to collect the money? What do you want me to do to the guy? Uh? You want me to break his legs? You wanta kneecap him? You want me to beat him up, break a few ribs, what do you want me to do?" Then he said, "my standard fee is five thousand dollars to kill somebody, not to collect, to kill." Rahman responded again, "I don't want to kill."

Rahman then explained that he would not hire Henke to kill Haik, because if he wanted to hire a hit man, he could get someone from the neighborhood to do the job for $200. Henke said, "you're not going to pay me two hundred dollars.... I'll walk, I'll walk away." Henke told Rahman to think the situation over, and talk to his family about the proposition Henke had offered.

Toward the end of the conversation, Rahman said, "Excuse me. If you break her leg ... or break her har[sic] arm or, something from her body, that's sixty thousand dollars." Henke responded, "Alright." Then, the following exchange occurred:

RAHMAN: Talk to the police, you call the police, is that money from eh, somebody else, you call somebody, you break my neck or break arm, just ... after I get it the money.

HENKE: Oh, I see.

RAHMAN: I want die.

HENKE: Alright. Alright. Now we're, okay.

RAHMAN: I, I don't wanna to break her neck, if I broke ...

HENKE: Okay.

RAHMAN: If I go ...

HENKE: So you want me to get the money and then kill him as soon as he gives me ...

RAHMAN: Uh get the money ...

HENKE: Alright.

RAHMAN: ... kill him.

Henke then closed the conversation by telling Rahman a final time that he would need $2,500 up front to kill Haik, and that he had no interest in obtaining a percentage of the merchandise. Rahman again responded that he promised that Henke would get twenty thousand if he could retrieve sixty thousand dollars. Henke said, "Alright. Send [Samara] out. Go back to [Samara] when you decide." Rahman indicated that he would, and departed from Henke.

### Haik Cooperates with FBI and Poses for Abduction Photo

After the February 12 meeting between Henke and Rahman, the FBI located Haik and the Christmas merchandise in Cincinnati. Haik admitted to participating in the purchase and sale of the goods, and agreed to cooperate with the government's investigation. The FBI proceeded to photograph Haik wearing a blindfold and holding a Cincinnati newspaper, so that it would appear that Haik was being held hostage. The FBI also took Haik's passport, as further evidence of Haik's captivity.

### Rahman Learns of "Abduction" of Haik from FBI "Hit Man"

Rahman never contacted Samara or Henke, nor did he evince any intention to pay Henke the requisite $2,500 up front money. Notwithstanding, on February 26, Henke turned up at the Windy City store uninvited, again wearing a recording device. Rahman was not at the store.

Instead, Henke spoke to Nashat. Mohammed was also present at the store. Henke told Nashat that through a stroke of luck, he had found Haik and the load. He said, "I talked to your father two weeks ago, alright. He never got back to me. I found this guy on my own." Henke represented to Nashat that "his boys" were holding Haik hostage, and he showed Nashat Haik's passport and the staged photographs of Haik. Nashat appeared stunned. Henke declared, "Yeah, my guys are holdin' him. . . . The deal is this. If, and I'm a business man, alright? This motherfucker is gonna die either way, whether you pay me or not. Now, I want you to understand that."

Bewildered, Nashat answered, "See, what I don't understand, is, let me ask what's happening like. . . . See like I know what's my, like, see me didn't say nothing to you, my father while I was listening. . . . I wanna know what's happening, okay?" Henke then explained, "what your dad told me, is that, what I want you to do is find the guy, get my stuff, go to him, I want you to get my sixty thousand dollars. He says the load was worth one hundred twenty thousand dollars. He saids [sic] get my sixty thousand dollars and kill the guy, and I said Abu, look. . . ." Nashat interrupted, "No see like my father won't ... (unintelligible) ... Whatever my father told you, let me told you like this, you heart, you got heart, right? You got heart."

Nashat telephoned his father, spoke in Arabic, and then handed the phone to Henke. (Only Henke's side of the conversation was recorded). Henke asked Rahman if Nashat had told him about the passport and photographs he had shown Nashat. Henke told Rahman that his "boys" were holding Haik, and that the longer they held him, the greater the problem they would have. Henke then began to complain that he had still received no money up front. He said,

So, I mean what do you think's fair up front here? Say, a thousand, fifteen, two? Okay. Right. Right. Uh hmm. Uh hmm. Yeah, now I understand, I, I understand Abu, but I'm a businessman too, see. And right now I'm in the driver's seat. I, I need some money up front. I got some costs here and I got some people that are working for me. Thousand sounds fair ... Well, well how do you feel about a thousand up front. I need something up front

for my boys. And then we'll work out with the load later.... I mean I wanna, I want something in hand. Like you know, right now. I know you can do that. Right, right. Uh, Abu I, I, I understand that, but I want something in my hand right now.... That's fair. Right. You give me five. Nashat? Alright hold on.

Henke testified that during the phone conversation, Rahman again tried to explain that Henke was to get one-third of whatever he could retrieve, but then finally agreed to come to the store with $500.

Henke went outside the store to wait for Rahman. He called the awaiting agents and told them, "Hook, line and sinker boys. He's going for a lousy five but uh, if he takes it we'll go.... Just talked to the old man, yeah. Yeah they're gonna give us a little something up front, it's not a lot, but hey. Then we're gonna take a ride in the truck and uh go get the merchandise." Henke then stepped back inside the store and spoke with Nashat. Nashat suggested to Henke that he should give Haik a chance to live, if Haik pays the money. Henke talked about bringing the merchandise back, but Nashat said that they did not want the goods back.

When Rahman arrived at the store, Henke showed him the passport and photographs. He told Rahman, "You, it's your call. We go get the money and everything's okay. What I'm saying is right now my boys are in trouble holding this guy, you know what I mean." Rahman responded, "I only wanted, ... you know eh, this I can, you have family, you know.... has family, you want easier family, I don't want this guy die, okay."

Soon thereafter, Mohammed entered the conversation [2] between Henke and Rahman, and interjected, "Excuse me, excuse, what's your name? ... Don. Uh, er, you know what Don, don't hurt the man." Henke said, "Alright." Mohammed continued, "Let me tell you something. Don't hurt the man, Abu Nashat or Nashat ... the son uh, no ... you be, go over to him, tell this my stuff."

The remainder of the taped conversation reveals that Nashat took over the negotiations with Henke, and that Rahman himself said very little. We highlight the portions of the conversation in which Rahman participated. Nashat reiterated that Henke should allow Haik to live, and give him a chance to come up with the money. Nashat pleaded, "Just like this. Don't, the reason I told you ... is everybody got family. Don't hit the man. Don't kill him. Everybody got heart, everybody it's hard, like the, don't kill him the man." Henke asked, "Well, what about up front money here? Before I go over. Cause the guy, I, I need something up front." Rahman said, "That's no problem." Nashat piped in, "And, and the man leave him, and and the man, give him chance." Rahman repeated, "Okay, no problem."

Henke explained to Rahman and Nashat that Haik believed he had been kidnapped because he had stolen the Mafia's merchandise. Rahman said, "Tell him that's my merchandise." Henke recommended instead that he would hold Haik at gunpoint and escort him to the bank for the money. Henke said, "That's what's gonna happen. Tomorrow he's gonna make a withdrawal. That's how we're gonna get the money. And he better not fuck up. And if he fucks us, hey, I don't...." At this point Rahman exclaimed, "No one fuck him up, no, no good."

Henke demanded his up front money again. Immediately after Rahman's last comment came the following exchange:

HENKE: No, alright. Thousand ...

RAHMAN: Just take the money.

HENKE: ... thousand up front and I'm outta here.

RAHMAN: Okay I give you the five hundred dollars now. It's just in my pocket I give it to you.

NASHAT: Lis ... listen my man, don't kill him. Leave. Leave him alone.

\*     \*     \*     \*     \*     \*

RAHMAN: After I gave the money ...

---

2. Henke testified that the transcript contains a mistake, and that these statements were made by Nashat, not Mohammed. We accredit the statement to Mohammed, according to the transcript, noting that the identity of the speaker here is not crucial, since no one contends that it is the defendant speaking.

NASHAT: ... leave him alone.

Nashat then asked Henke to bring him along to see Haik in Cincinnati. The men negotiated whether they would accept a check from Haik. Henke said he would not accept a check. Rahman tried to convince Henke that a check would suffice, saying, "But put it money with the bank. Maybe he'll cancel it the check. Go to the bank. I cash it this check. After I cashed the check, okay? ... Tell him bye-bye.... Just don't, don't hit him...."

Finally, Nashat advanced to Henke the idea of "scaring" Haik, letting him go, and giving him several days to procure the money. At no time during the entire conversation did Rahman himself suggest violence or threats, or ask to accompany Henke to Cincinnati. Rahman paid Henke the $500. Henke left the store, and told the other agents, "It's a home run.... Home run world ain't it," which was a code signal to initiate arrest. The FBI agents arrested Rahman.

**The Charges**

Rahman was indicted on three counts.[3] Count I charges Rahman with solicitation of a person to extort and rob a second person in violation of 18 U.S.C. § 373. Count II charges Rahman with attempted extortion of $60,000 from a person through the wrongful use of actual and threatened force, violence and fear in violation of 18 U.S.C. § 1951. Count III alleges attempted robbery of $60,000 from a person by means of actual and threatened force, violence, and fear in violation of 18 U.S.C. § 1951.

## ANALYSIS

Rahman argues that there was insufficient evidence to convict him of solicitation, attempted extortion, and attempted robbery.

■ As we have often stated, defendants who seek to have their convictions reversed on the basis of insufficient evidence carry a heavy burden. We review the evidence in the light most favorable to the

government, and reverse only if we determine that no rational jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Jean,* 25 F.3d 588, 595 (7th Cir.1994). We have noted however, that our sufficiency of the evidence standard does not require the defendant to demonstrate that no evidence at all supports the conviction, but rather that the evidence cannot support a finding of guilt beyond a reasonable doubt. *United States v. DeCorte,* 851 F.2d 948, 952 n. 2 (7th Cir.1988). The Supreme Court has held that a "mere modicum" of evidence may satisfy a "no evidence" standard; however, it could not by itself rationally support a conviction beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

## Count I—Solicitation

■ Subsection (a) of 18 U.S.C. § 373 provides, in pertinent part that:

Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned...."

The government alleged that Rahman solicited Henke to extort and rob Haik. Thus, the government was required to show two elements. First, the government had to show, with *"strongly corroborative"* circumstances, that Rahman intended for Henke to extort and rob Haik of $60,000. Second, the government had to show that Rahman solicited, commanded, induced, or otherwise tried to persuade Henke to carry out the extortion and robbery. *See United States v. Buckalew,* 859 F.2d 1052, 1053 (1st Cir.1988). We do not believe that the evidence is sufficient to support either element.

---

**3.** Prior to trial, the government dismissed Count Four of the indictment which charged Rahman

with a Travel Act violation to promote extortion.

For clarity, we summarize the evidence against Rahman before we examine the evidence in detail. Rahman was angered by Haik's actions and belligerently voiced his ill will toward Haik. FBI agent Henke, posing as a Mafia hit man, attempted to get Rahman to hire him to kill or rob Haik. Rahman spoke to Henke and sought to use Henke as a bill collector. Henke explained that he could only be hired to kill or maim Haik. Henke told Rahman that $2,500 had to be paid up front for Henke to kill Haik. Henke concluded the discussion by telling Rahman, "go back to [Samara] when you decide." After that meeting, Rahman never contacted Samara or took any action to hire Henke. Two weeks later, Henke appeared and told Rahman that he had kidnapped Haik and retrieved the goods, on his own initiative. Rahman and his son were surprised that Henke had done anything, since Rahman had neither spoken with Samara or Henke, nor had he paid the supposedly requisite up-front money. Henke then demanded money from Rahman for services rendered, and Rahman paid him. Rahman and Nashat requested that Henke spare Haik's life, since they had paid Henke as requested. Nashat then suggested that they might as well get the money from Haik, perhaps by "scaring" him. Rahman said nothing about "scaring" Haik; however, Rahman spoke one sentence regarding acceptance of a check from Haik, which indicated that he was still interested in retrieving the money from Haik.

With this evidence, the government has not proven beyond a reasonable doubt Rahman's intent to extort and rob Haik, nor have they proven his intent to solicit Henke to perform those crimes of violence. During the first meeting between Rahman and Henke, Henke repeatedly asked Rahman if Rahman wanted him to kill or beat Haik. Rahman clearly denied wanting to kill Haik. Rahman also never acquiesced to any violence against Haik, nor did he affirmatively suggest that Henke commit any violent act. He promised only that Henke could have a third of whatever amount of money he could retrieve from Haik.

What Rahman exactly said during this first meeting, however, is beside the point. The meeting did not end with an agreement between Rahman and Henke. Henke required Rahman to contact him through Samara, and pay $2,500 in up front money, before he would kill or rob Haik. For two weeks Rahman did not contact Henke, as he was instructed to do. Henke admitted during the second meeting that Rahman had not gotten back to him, and that he had chosen to forego the required $2,500 in up front money by capturing Haik on his own initiative. Thus, from the first conversation, there was no direct evidence that Rahman even contemplated robbery or extortion of Haik. More importantly, there was no evidence at all that Rahman intended to solicit Henke to rob or extort Haik.

At the second meeting, both father and son were clearly surprised that Henke had kidnapped Haik without being asked or paid to do so. Rahman believed that Henke had, on his own, *already* accomplished the task of frightening Haik and retrieving the merchandise, by kidnapping him and telling him that he had angered the Mafia. Therefore, at the time of the second meeting, it was impossible for Rahman to have *intended*, then *persuaded* Henke to carry out something Henke had already eagerly done without their knowledge or acquiescence.

Furthermore, the transcript demonstrates that Rahman and Nashat were afraid that Henke would kill Haik, as he threatened to do whether or not Rahman paid Henke any money. Rahman and Nashat both pleaded with Henke not to kill Haik, not to hurt him, and to release him. Under the circumstances, it was not unreasonable for Rahman to have paid Henke the $500 Henke demanded. Indeed, in Henke's own words, he was "in the driver's seat," being a Mafia hit man who had just kidnapped someone and who had "boys" who needed money for their expenses. Rahman instructed Henke to "just take the money," with Nashat adding that Henke should then just "leave [Haik] alone." Thus, even viewed in the light most favorable to the government, the $500 payment did not tend to prove Rahman's intent to solicit Henke to carry out a crime of violence. Instead, the payment appears to have been Rahman's attempt to appease a hit man who,

having already committed the crime of violence, was demanding remuneration and, at the same time, was threatening to kill Haik.

The government further points to several sentence fragments in the transcript spoken by Rahman, to support its contention that Rahman intended and solicited Henke to extort and rob Haik.[4] Our review of the record, however, reveals that no reasonable jury could have based a conviction on a strict literal interpretation of a few words of Rahman's rudimentary English. Rahman had a tendency to answer Henke's questions by simply repeating what Henke said. Furthermore, after Rahman answered, "Uh huh yes," to Henke's question, "you want somebody dead, is that right?," Rahman immediately turned to Samara and explained in Arabic that he did not want the hit man to kill Haik. The record as a whole overwhelmingly contradicts the contents of these few fragments taken literally.

The government's argument that Rahman paid Henke the $500 because he intended for Henke to "scare" the money out of Haik is also unfounded. *Nashat*, not Rahman, toward the end of the second meeting was the one who suggested that Henke scare Haik. The fact that Rahman may still have wanted to get the money from Haik at the second meeting may, as the government puts it, illustrate his "greed"; however, it is too meager to support a conviction which requires Rahman to have, beyond a reasonable doubt, both intended and solicited Henke to rob and extort Haik. Certainly there is a distinction, for example, between a person who hires an assassin to kill his spouse so that he may collect the insurance proceeds, and a person whose spouse is murdered without his involvement, but who then cheerfully collects the insurance proceeds. The former person is guilty of solicitation; the latter only of poor character and avarice.

Rahman's behavior with regard to the trailer of merchandise is reprehensible. However, we must conclude that even in the light most favorable to the government, there was scant evidence to show, let alone meet the statutory requirement to strongly corrob-

orate, Rahman's intent to have Henke rob and extort Haik. Similarly, there was insufficient evidence for a rational jury to find, beyond a reasonable doubt, that Rahman tried to induce Henke to carry out those crimes.

## Counts Two and Three—Extortion and Robbery

Because we have held that there is insufficient evidence for a jury to find that Rahman intended for Henke to rob and extort Haik, we must also reverse Rahman's convictions for attempted extortion and attempted robbery.

The federal provision prohibiting extortion and robbery defines those terms in the following way:

> (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property. . . .

> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951(b)(1)–(2).

■ Certainly, the government did not present sufficient evidence to convict Rahman of attempted robbery. Henke repeatedly asked Rahman how he should collect the money from Haik, if not by murder, in case Haik refused to pay willingly. Rahman never responded in any way that indicated that he intended Henke to obtain the money *against Haik's will* by means of force or threatened force. In fact at the second meeting, when Henke suggested escorting Haik to the bank at gunpoint, Rahman responded, "No one fuck him up, no, no good." Even Nashat, who suggested Henke "scare" Haik, then free him to procure the money, never suggested that Henke should take any steps to obtain the money against Haik's will through force or threats of force. No ration-

---

4. Specifically, the government refers us to two instances where Rahman responded in the affir-

mative when Henke asked whether Rahman wanted to have Haik killed.

al jury could have found that Rahman intended to rob Haik.

 Finally, for the reasons we have discussed, we do not believe that a rational jury could have found that Rahman intended to extort Haik by inducing him to consensually relinquish $60,000 through threatened force, violence, or fear. There was no evidence that Rahman intended to hire Henke to threaten Haik at all after the first meeting. At the second meeting, Rahman could not have intended for Henke to extort the money from Haik, because he believed that Henke had already kidnapped Haik, and extorted or robbed him of the merchandise. The only modicum of evidence against Rahman was that he mentioned cashing a check he believed Haik would tender after Henke released him. In light of the tense and unorthodox circumstances created by the preemptive "kidnapping" of Haik, Rahman's failure to defy a Mafia hit man's demand for money and instruct him to undo the effects of the kidnapping, can hardly be the basis of a criminal conviction.

## CONCLUSION

For the foregoing reasons, the convictions of Jawdat Abdel Rahman on Counts I, II, and III are

REVERSED.