UNITED STATES of America, Plaintiff–Appellee,

v.

Todd CUNNINGHAM, Richard G. Hanus, Timothy Marlette, and Vince Gallo, Defendants–Appellants.

Nos. 94–2102, 94–2127, 94–2162, 94–2727.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1994.

Decided April 19, 1995.

---

**10.** Or, under *Strickland*, if a potential conflict prejudiced Daniels' case, the plea is invalid.

Andrew B. Baker, Jr., Ronald J. Kurpiers, Asst. U.S. Attys., Joseph Alexis Cooley (argued), Office of the U.S. Atty., Dyer, IN, for U.S.

John S. Dull (argued), Dull & Duggan, Merrillville, IN, for Todd Cunningham.

Michael W. Bosch (argued), Bamber, Bosch & Banasiak, Hammond, IN, for Richard Hanus.

Steve Lustina (argued), Merrillville, IN, for Timothy Marlette.

Nick J. Thiros, Steven Bower (argued), Cohen & Thiros, Merrillville, IN, for Vince Gallo.

Before CUMMINGS, ESCHBACH, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Todd Cunningham, Richard Hanus, Timothy Marlette, and Vince Gallo appeal their convictions for retaliating against a federal witness. Gallo also appeals his sentence. We affirm both the convictions and the sentence.

## I. Background

In March 1993, Keith Bolen was tried in federal court for shooting at a private airplane with a high-powered rifle. Terry Potts, who had been with Bolen when he allegedly shot at the airplane, testified

against Bolen. Ultimately Bolen was acquitted, but his trial received publicity in the region surrounding the small Indiana community of Cedar Lake, where Bolen, Potts, and the defendants in this case all lived. Newspaper accounts of Potts' testimony appeared, and the trial was widely discussed.

A few months later, on Friday, July 2, 1993, Potts, together with his boss and his boss' girlfriend, went to the Cedar Lake Summerfest, a Fourth of July festival that lasted for several days. The defendants also went to the Summerfest, and spent the day drinking beer, eating fried catfish, and watching such dubious entertainment as women's mud wrestling.

Around 8 P.M., Potts was drinking in the beer garden, an area with several picnic tables under a tent where beer had been served all day. While in the beer garden, Potts got into an altercation with Gary Garcia, a friend of both Bolen and the defendants. Potts and Garcia yelled and cursed at each other, and pushed each other several times. With Garcia in the beer garden were Cunningham, Marlette, Hanus and Gallo. Only Garcia was physically involved in the initial altercation with Potts, although Hanus did try to break up the fight. Festival security guards quickly separated Potts and Garcia and removed Potts from the tent. While he was being removed, Potts loudly complained that he had been a federal witness, that Garcia was attacking him because he had been a federal witness, and that he should be allowed to stay in the beer garden while Garcia and his friends should be thrown out.

The security guards delivered Potts to an off-duty Cedar Lake police officer, Roger Patz. Patz calmed Potts down and then left, but shortly thereafter Potts again got into a verbal altercation with Marlette and Hanus, who had remained in the beer garden. Potts was standing outside the beer garden, on the other side of two low fences, so there was no physical contact, but much in the way of cursing, threatening, and obscene gestures was passed back and forth. The security guards arrived again, and Patz escorted Potts out of the festival grounds and told him he should go home. Potts asked Patz to walk him all the way to his car, several hundred yards down the road, telling Patz he was afraid of the people with whom he had been arguing, because they wanted to harm him for testifying against their friend. Patz, however, said he could not leave the festival grounds, so Potts walked to his truck alone.

When he got to his truck, Potts was beaten up. Witnesses told different versions of the events, but there was no dispute at trial that Hanus, at least, struck Potts several times and wrestled with him on the ground. The other defendants all denied touching Potts, but they admitted standing nearby while the fight was going on. Potts was severely beaten: his head was cut in several places, gravel was imbedded in his skin, and he had a bootprint on his face.

Three sisters who were walking by screamed for the beating to stop. They and others passing by summoned police, who arrived very quickly, but after the fighting had ended. Hanus had fled, and the other defendants were milling around as part of a large crowd that had gathered.

A grand jury indicted Cunningham, Hanus, Marlette and Gallo, and after a joint trial a jury convicted them of retaliating against a federal witness in violation of 18 U.S.C. § 1513. The three sisters who had seen the fight and called the police, Sharon Miller, Sandra Reeves, and Ethel Herron, testified against the defendants. The district court sentenced Cunningham, Hanus, and Marlette each to 33 months in prison, and sentenced Gallo to 27 months in prison.

## II. Analysis

### A. Sufficiency of the Evidence

All four defendants argue that there was insufficient evidence to support their convictions. As we have often repeated, those who challenge their convictions on this basis bear a very heavy burden. *United States v. Rahman,* 34 F.3d 1331, 1337 (7th Cir.1994). We view the evidence in the light most favorable to the prosecution and decide whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Id.* We will not weigh the evidence anew, nor will we assess

the credibility of the witnesses. *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986).

■ To prove that the defendants violated § 1513, the government had to prove that Cunningham, Hanus, Marlette and Gallo each caused bodily injury to Potts with the intent to retaliate for his earlier testimony. *See* 18 U.S.C. § 1513; *United States v. Johnson*, 903 F.2d 1084, 1087 (7th Cir.1990).[1] "Bodily injury" encompasses practically any adverse impact on the victim, including simple physical pain or an extremely transitory injury. *See* 18 U.S.C. § 1515(a)(5). There is no dispute that the beating resulted in bodily injury to Potts; instead, the disagreement revolves around who caused injury and with what intent.

Cunningham, Marlette, and Gallo argue both that there was insufficient evidence to find that they caused any bodily harm to Potts, and that there was insufficient evidence to find that they had any intent to retaliate against Potts. Hanus, on the other hand, admits that he caused Potts bodily injury, but joins the other defendants' argument that there was inadequate evidence of his intent to retaliate. All these arguments fail.

■ Witnesses specifically identified Cunningham, Marlette, and Gallo as each striking Potts. Potts himself testified that after he fell to the ground, wrestling with Hanus, Marlette kicked him in the face, leaving a large cut and a bootprint. Potts further testified that while he was wrestling on the ground, he felt others kicking his legs and back. Sharon Miller testified that she saw all four defendants simultaneously attack Potts and that she saw Marlette kick Potts in the head. Sandra Reeves specifically identified all four defendants as each hitting and kicking Potts, as did Ethel Herron. Cunningham, Marlette, and Gallo each denied the witnesses' accounts, but the evidence clearly was enough for a rational jury to find that each of those three defendants, in addition to Hanus, caused Potts bodily injury.

■ The defendants' fallback position is that there was insufficient evidence of their intent to retaliate against Potts. Here also there is considerable direct evidence to support the convictions. Potts testified that just before the beating began, Marlette said "Well, Mr. Federal Witness, where are your fed buddies now? Let's see if they can get you out of this mess." Potts also testified that while he was on the ground, he heard Gallo say "Show him what we do to federal witnesses." Finally, Potts testified that Cunningham also referred to him during the beating as "Mr. Federal Witness." Miller, Reeves, and Herron all testified that while they were beating Potts, the four defendants were calling him "narc," "snitch," and "fed."

■ In addition to that direct evidence of intent, abundant circumstantial evidence exists. Circumstantial evidence of intent is just as probative as direct evidence. *United States v. DeCorte*, 851 F.2d 948, 954 (7th Cir.1988). Juries may use common sense to evaluate the evidence and make reasonable inferences from it. *Johnson*, 903 F.2d at 1087–88. Cunningham, Marlette, and Gallo admitted that they knew Potts had testified against Bolen and that Bolen was their friend. Hanus denied knowing about Potts' testimony, but a rational jury could have inferred that Hanus did know. The jury heard at trial that the Bolen case was covered in a local newspaper and that the case was a major topic of discussion in the community. Moreover, during the first altercation, in the beer garden, Potts yelled that he was a federal witness, from which jurors could further infer Hanus had known of Potts' earlier testimony.

Given their knowledge of Potts' testimony and reason to retaliate, the defendants' actions were consistent with an intent to retaliate. After the initial altercation, and after Potts left the festival grounds, Marlette asked a security guard where Potts had

---

1. 18 U.S.C. § 1513(a) provides:
   Whoever knowingly engages in any conduct and thereby causes bodily injury to another person ... with intent to retaliate against any person for ... the attendance of a witness or party at an official proceeding, or any testimony given ... by a witness in an official proceeding ... shall be fined not more than $250,-000 or imprisoned not more than ten years, or both.

gone. Shortly thereafter Cunningham, Hanus, Marlette and Gallo all ran several hundred yards after Potts, who was walking toward his truck, and then proceeded to thrash him. That sequence of actions supported an inference of intent to retaliate. Furthermore, the defendants' references during the beating to Potts' testimony also suggested an intent to retaliate on the part of each defendant. *See United States v. Cofield,* 11 F.3d 413, 419 (4th Cir.1993) (holding that a statement made by one defendant during a beating about the beating victim's testimony supported an inference that another, non-speaking, defendant intended to retaliate against the victim in violation of 18 U.S.C. § 1513), *cert. denied,* —— U.S. ——, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994).

In sum, the evidence produced at trial more than adequately supported, both directly and by inference, that all four defendants caused bodily injury to Potts with the intent to retaliate against him for his testimony. The defendants press upon this court their version of the story: that a drunken Potts instigated the fight, and that the fight had nothing to do with Potts' earlier testimony. They emphasize testimony that arguably supports their version and contradicts that of other witnesses. But the question is not whether a rational jury could have agreed with the defendants' version of the story, based on the evidence presented. Rather, it is whether any rational jury could conclude as did the actual jury. The jury was entitled to believe the witnesses whose testimony implicated the defendants. We see no irrationality in the jury's decision.

### B. Prosecution's Statements in Closing Argument

■ The defendants argue that we must throw out the verdicts against them because the prosecutor's improper remarks during closing statements violated their right to a fair trial. The government made only a brief rebuttal to the defendants' closing argument; about half the rebuttal was the following:

These four men believed that nobody was going to stop them because they got away with it.... And they all sit here right now, thinking, "Who's going to stop us?" Well, there's 12 people here today that can do that.

Collectively you can go back there and stop them. You can make sure that Terry Potts isn't going to get beat up again. Heaven forbid, for the witnesses that came in this courtroom the last couple days if these guys are found not guilty. Heaven forbid. Don't let that happen.

Defense counsel objected and asked the district court to strike the prosecutor's comments from the record, but the court denied the request without comment.[2]

■ The defendants argue that they are entitled to a new trial because the government's argument amounted to improperly saying that convictions were necessary to protect Potts and other witnesses. In general, a defendant is entitled to a new trial only if the government's comments were both improper and prejudicial to the defendant's right to a fair trial. *United States v. Henry,* 2 F.3d 792, 794 (7th Cir.1993). "We will not lightly overturn a criminal conviction 'on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'" *United States v. Neely,* 980 F.2d 1074, 1083 (7th Cir.1992) (quoting *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)).

■ The prosecutor's comment was improper. The government may not attempt to obtain a conviction by appealing to jurors to prevent future crimes by finding present guilt. *United States v. Severson,* 3 F.3d 1005, 1015 (7th Cir.1993) (stating that any comment inviting conviction for reasons other than proof of guilt beyond a reasonable doubt is improper); *United States v. Mona-*

---

2. The government argues that we should only review for plain error. It claims that the defense's objection was insufficient because it inadequately stated the grounds on which it was based. However, defense counsel objected to the "comment on the testimony," clearly objecting to the impropriety of the prosecutor's comments. The objection was adequate to preserve appellate review.

*ghan,* 741 F.2d 1434, 1441 (D.C.Cir.1984) (stating that appeals to jurors to deter future lawbreaking are improper), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985). The government argues that the prosecutor was merely illustrating the "seriousness of the crime and its threat to society." *See, e.g., United States v. Ferguson,* 935 F.2d 1518, 1530–31 (7th Cir.1991). However, the prosecutor here was not illustrating the threat that the charged crime had posed to society, but rather was conjuring up a specter of future harm resulting from a new crime, a different matter entirely. That was improper.

■■■■■ But while we agree with the defendants that the prosecution acted improperly, we must further determine if prejudice to the defendants resulted. We think it did not. To determine the impact on the defense of a prosecutor's improper comment, we look at (1) the nature and seriousness of the prosecutor's misconduct; (2) whether the prosecutor's statements were invited by impermissible conduct of defense counsel; (3) whether the trial court instructed the jury to disregard the statements; (4) whether the defense was able to counter the improper arguments of counsel; and (5) the weight of the evidence against the defendant. *United States v. Kelly,* 991 F.2d 1308, 1315 (7th Cir.1993) (citing *Darden v. Wainwright,* 477 U.S. 168, 181–82, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986)). We find that the bulk of these factors favors upholding the jury's verdict.

First, while the statement was improper, it was not highly inflammatory. *See Darden,* 477 U.S. at 180 n. 12, 106 S.Ct. at 2471 n. 12 (finding that prosecutor's comment that he wished he could see the defendant's face blown away by a shotgun did not require reversal); *Kelly,* 991 F.2d at 1315 (finding prosecutor's statement improper and "not trivial," but not highly inflammatory). Second, right after the statement, the district court properly instructed the jury that closing arguments were not evidence and were only for the purpose of discussing the evi-

dence. *See Henry,* 2 F.3d at 795 (finding that the giving of such an instruction immediately after the prosecutor's improper statement was adequate to prevent prejudice). Third, the weight of the evidence, while not overwhelming, was substantial, and it was strong enough to overcome the marginal ill effects of the prosecutor's improper appeal.

On the other hand, two of the five factors support a finding of prejudice. The defendants did not invite the prosecutor's totally gratuitous statement. Nor did the defendants have any chance to rebut the statement. But after considering and balancing the five factors and their place in the larger context of the trial, we hold that no prejudice resulted from the prosecutor's comment and thus that the prosecutor's statements did not render the trial unfair. We conclude that none of the defendants is entitled to a new trial.

### C. Miscellaneous

The rest of defendants' arguments are less substantial, and we dispose of them with brief discussion. Hanus argues that the district court erred when it rejected an instruction he offered. That instruction essentially said that merely finding that a defendant assaulted Potts was not enough to convict him of the charge and that, unless the jury found that the defendant "had a belief" that Potts had testified against Bolen, he could not be found guilty. By "had a belief," the instruction apparently meant to convey that to find guilt the jury must find that each defendant knew of Potts' prior testimony, which Hanus denied at trial.[3] Hanus argues that rejecting the tendered instruction was tantamount to denying him an instruction on his defense, which was that he knew nothing of Potts' testimony and thus could not have had the intent to retaliate against him.

■■■■■ However, the instructions the court did give adequately covered Hanus' defense. A district court has latitude in wording instructions and may reject an instruction offered by a defendant, as long as

3. Cunningham, Marlette, and Gallo adopt Hanus' argument about the rejected jury instruction. But since they admit they knew that Potts had testified, the jury instruction would not have been applicable to them anyway. Therefore we address specifically how the instruction would have applied to Hanus, but reject the argument as applied to all the defendants.

the essential points are covered by the instructions the court does give. *United States v. Durades*, 929 F.2d 1160, 1167 (7th Cir.1991). The district court instructed the jury that to find guilt it must find that the defendants acted with the intent to retaliate against Potts for his earlier testimony. To have intent to retaliate for earlier testimony a defendant must have known about the earlier testimony. Thus, Hanus' defense was necessarily included in the charged crime. Therefore, the given instruction adequately covered Hanus' defense. Requiring the district court to expand further on the already obvious would be superfluous, confusing and an unnecessary burden on the district court. The jury was properly and adequately instructed: Hanus is merely disappointed that the jurors disbelieved his not-very-credible denials of knowledge.

■ Gallo argues that the district court erred in applying U.S.S.G. § 2J1.2(b) in determining his sentence. Section 2J1.2(a) provides that the base offense level for several statutory offenses involving obstruction of justice is twelve. However, § 2J1.2(b) further provides that if the offense "involved causing or threatening to cause physical injury to a person" the court is to increase the base offense level by eight levels, as the district court did for all the defendants. U.S.S.G. § 2J1.2 explicitly applies to 18 U.S.C. § 1513, and obviously the offense level when sentencing someone convicted under 18 U.S.C. § 1513 will normally be twenty, because § 1513 by its language only applies to actions causing or threatening to cause bodily injury.

Gallo argues that he should not have received the eight-level increase without the district court first making an explicit factual finding that injury to Potts was the result of an intent to retaliate. Gallo says that an "automatic" increase is illegitimate, but there may be a misunderstanding about the Sentencing Guidelines scheme. Section 2J1.2(b) is not a sentence adjustment, which might require a factual finding to support it; rather, it mandates calculating the sentence using a higher offense level any time an offense among those to which § 2J1.2 is applicable involves real or threatened physical injury.

We have very recently approved using § 2J1.2(b) to determine sentences under 18 U.S.C. § 1513. *See United States v. Duarte*, 28 F.3d 47, 48 (7th Cir.1994). Gallo focuses on the sufficiency of the evidence, again arguing that he never touched Potts and thus his offense could not have involved "real or threatened physical injury." But we have already decided that the evidence was enough to support his conviction, and thus his argument must fail. We reject Gallo's theory and conclude that the district court's sentencing was entirely proper.

■ Gallo's final argument is that the district court should have departed downwards from the Guidelines when it imposed Gallo's sentence, based on Potts' testimony at sentencing. Potts testified at Gallo's sentencing that he did not think Gallo should have to go to jail, that Gallo had a lesser role in the offense, and that Potts hoped that the court would be lenient to Gallo. The district court responded, when imposing sentence, that while it was sure Potts' testimony had been "sincere," it had "discounted" the testimony. Nonetheless, the court adjusted Gallo's sentence downward, because Gallo was a "minor participant" under U.S.S.G. § 3B1.2.

Gallo insists that the court erred by not departing further downward, arguing that U.S.S.G. § 1B1.4 says the court "may consider ... any information" in determining whether to depart from the guidelines. But it is permissive, not mandatory: the district court *may* consider, not *must* consider, information in determining whether to depart from the Guidelines, and moreover the record shows that the district court did consider Potts' testimony.

### III. Conclusion

Fights among young men on Friday nights in places like Cedar Lake, Indiana—following too many beers—are not uncommon. Retaliation for some actual or perceived insult is often the cause of these "head thumpings." The aggravating factor in this Friday night exercise was that the defendants' retaliation against Potts grew out of his testimony as a witness in a federal prosecution. Thus, a relatively low-level state crime escalated dramatically into a federal offense. Rather than

probation or a short stay in the local jail for the typical alcohol-induced brawl, the defendants received sentences ranging from 27 to 33 months in federal prison.

The hard lesson learned by these defendants is that beating up a person because he testified on behalf of the government in a federal prosecution is a substantially different matter than punching out someone because he spilled beer on your girlfriend.

In many respects, this had the appearance of a routine Friday night bar fight, indeed, striking blows in retaliation constitutes the same physical acts. But it is the intent behind the blows struck that "upped the ante." The heavier penalties dictated for the crime of retaliation against a federal witness are grounded in the highly serious concern of protecting the integrity of the federal judicial system and those who are called to participate in it. It is this legitimate societal concern that causes the defendants to pay a higher price for their conduct at the Cedar Lake Summerfest.

We AFFIRM the convictions of Cunningham, Hanus, Marlette and Gallo, as well as the sentence of Gallo.