Joseph RODRIGUEZ, Plaintiff–Appellant,

v.

Howard A. PETERS, III, Director, Department of Corrections, State of Illinois, Defendant–Appellee.

No. 93–3724.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1994.

Decided Aug. 15, 1995.

---

**550**

Geary W. Kull (argued), Chicago, IL, for plaintiff-appellant.

Rita M. Novak, Office of Atty. Gen., Steven R. Splitt (argued), Office of Atty. Gen., Crim. Appeals Div., Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, and REAVLEY * and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Joseph Rodriguez, a juvenile of fifteen years of age, was charged in a delinquency petition with two counts of murder, filed on December 16, 1981, in the Juvenile Division of the Circuit Court of Cook County, Illinois. The State's Attorney filed a motion to transfer jurisdiction to the Criminal Division of the Circuit Court, permitting prosecution under the criminal laws of Illinois pursuant to Ill.Rev.Stat. ch. 37, par. 702–7.[1] On February 3, 1982, the Juvenile Court authorized the transfer of the defendant for trial as an adult in the Criminal Division of the Circuit Court of Cook County. He was charged with and convicted before a jury of murdering Joseph and Theresa Palmer, also juveniles, in violation of Ill.Rev.Stat.1981, ch. 38, par. 9–1(a)(1). Because Rodriguez was found guilty of committing more than one murder, he was sentenced to the mandatory natural life sentence, without the possibility of parole, as provided in Ill.Rev.Stat.1981, ch. 38, par. 1005–8–1(a)(1)(C). The Illinois appellate court affirmed his conviction and sentence[2] and the Illinois Supreme Court denied his Petition for Leave to Appeal. Rodriguez's Petition for Writ of Certiorari was denied by the United States Supreme Court and he thereafter filed a Petition for Writ of Habeas Corpus, 28 U.S.C. § 2254, in the U.S. District Court for the Northern District of Illinois. The district court denied his petition. Rodriguez appeals. We AFFIRM.

## I. FACTUAL BACKGROUND

Renaldo Hernandez and Joseph Rodriguez were members of a Chicago, Illinois street gang known as the Kool Gang. In 1981, a dispute arose between this gang and the

---

* Hon. Thomas M. Reavley, Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

1. Ill.Rev.Stat. ch. 37, par. 702–7 of the Juvenile Court Act provided:

 (3) If a petition alleges commission by a minor 13 years of age or over of an act which constitutes a crime under the laws of this State, and, on motion of the State's Attorney, a Juvenile Judge, designated by the Chief Judge of the

Circuit to hear and determine such motions, after investigation and hearing but before commencement of the adjudicatory hearing, finds that it is not in the best interest of the minor or the public to proceed under this Act, the court may enter an order permitting prosecution under the criminal laws.

2. *People v. Rodriguez*, 134 Ill.App.3d 582, 89 Ill. Dec. 404, 480 N.E.2d 1147 (1 Dist.1985).

Villalobos, another Chicago street gang, allegedly because the Villalobos had one of the Kool Gang's jerseys in their possession.[3] Representatives of the two gangs met to discuss the return of the jersey and they agreed that the Kool Gang would buy it back from the Villalobos for $5 to $10. The membership of two gangs failed to consummate the agreed upon return of the jersey with the cash payment for, as Hernandez explained, each gang was afraid to enter the other gang's territory. Rodriguez met with Charles Palmer, a member of the Villalobos, later in the summer, after Palmer had agreed to inquire of his gang concerning the whereabouts of the jersey, he subsequently advised Rodriguez that the jersey had been sold.

Sometime thereafter, on December 12, 1981, around 5:30 p.m., Rodriguez and Hernandez saw Joseph and Theresa Palmer, Charles Palmer's younger brother and sister, walking towards their home and mistook Joseph for his brother, Charles. Rodriguez asked Hernandez if he wanted to kill them, and Hernandez responded that it was "up to you" (Rodriguez). Rodriguez then asked Hernandez to get the gun from his house that he was holding for Rodriguez. Hernandez returned with the weapon and handed it to the defendant. Thereafter, Rodriguez and Hernandez waited in a nearby park for Theresa and Joseph to walk past them, and after the Palmers had passed, Rodriguez and Hernandez snuck down an alley and waited for Theresa and Joseph behind the Palmer's house. As they approached, Rodriguez entered a vacant lot on the east side of the Palmer's house, positioned himself, raised his gun, and fired, mortally wounding Joseph in the back of his head. Theresa began to scream; Rodriguez fired again and silenced her with three shots to the head. Hernandez stated that he and Rodriguez then fled from the scene leaving Joseph and Theresa both

lying on the sidewalk, dying from the gunshot wounds.

Hernandez was arrested three days later, on December 15, 1981, at one of his friend's houses, and Rodriguez turned himself in to the authorities five days thereafter, on December 20, 1981. On December 16, while Hernandez was in custody, the State's Attorney questioned him about his involvement in the murders. Originally he denied that he and Rodriguez were responsible for the murders to the police, but approximately one month before Rodriguez's trial, Kathleen McGury, a State's Attorney, asked him if he would be willing to testify against Rodriguez in exchange for a plea to a lesser crime. At that time, Hernandez's attorney advised him that if he were convicted of the double homicide he would be sentenced to a mandatory term of natural life in prison without the possibility of parole. After having been advised of this, Hernandez decided to accept the plea bargain and enter a plea to the lesser charge of obstructing justice, agreeing to testify for the state against Rodriguez, in exchange for the State's Attorney's recommendation that he receive a sentence of four years of imprisonment for obstruction of justice.[4]

In addition to Hernandez, the State also called Theresa Santana to testify at trial. Santana lived in an apartment across the street from the victims and had known Rodriguez for several years, having attended both grade and high school with him. Santana testified that as she was walking down a staircase on the outside of her apartment building on December 12, 1981, she saw Joseph and Theresa Palmer walking toward their home, and at the same time observed Rodriguez, wearing black pants and a black leather jacket, across the street. Testifying about Rodriguez, she stated that "he just

**3.** When one gang is in possession of a jersey from another gang, the gangs refer to it as "flying somebody else's colors." Hernandez testified that the gangs consider this action an extreme insult and it is reason to kill the members of the other gang.

**4.** Hernandez was charged with obstruction of justice because immediately after arrest he denied, to the police, that he was involved in the

murders. Furthermore, when he was taken before the grand jury on February 8, 1982, some six months before Rodriguez's trial, he continued his denial and even testified falsely under oath when he stated that he and Rodriguez were at a friend's house at the time of the murders, and that they had never discussed killing Charles Palmer.

kept on walking and then he stopped and looked at me," but before she could speak with him, he turned and jogged back across the street toward a vacant lot. Santana continued to watch Rodriguez as he unzipped his jacket, pulled out a gun, and aimed and fired gunshots at the Palmers. As the Palmers lay fatally wounded on the sidewalk, Santana continued to watch and observed Rodriguez run across a vacant lot, enter a red car, and drive off.

At trial, Santana also testified that she spoke to the police on the evening of the shootings and gave them a description of the murderer, but Santana explained that she did never mentioned the name of the killer[5] because she was afraid of retaliation from members of the Kool Gang; in fact, she remained inside her house for approximately four weeks after the shooting and did not attend school because she was fearful of facing any members of Rodriguez's gang at school. The day after the killing, the police spoke with Santana again and handed her a police photo album containing pictures of members of the Kool Gang.[6] Rodriguez's photograph was in the book, and although Santana did not I.D. him at that time, Officer McKenna testified that he observed that as she saw the defendant's picture, she appeared to be "very nervous, visibly shaken."

After observing her reaction, Officer McKenna was convinced that Santana could identify the killer. Thus, the police returned to her house two days later with a yearbook containing a picture of her high school class. She looked through the pictures in the yearbook and pointed to and identified Rodriguez as the assailant, within seventy-two hours of the homicides. Later that month, she also identified the defendant in a police lineup in the presence of Rodriguez's attorney. Once

the identifications were made, the State of Illinois placed Santana into a witness relocation program and moved her out of state. The defense made a motion *in limine* to preclude the prosecution from referring to the fact that Santana had been relocated and the court ruled that the prosecution could not discuss the fact of relocation unless the defense mentioned the information first.

Danny O'Neal Morris, a twenty-four year old resident of the neighborhood where the murders took place, also testified for the prosecution. He stated that he was sitting on a couch, near a window in his second floor apartment, at about 5:45 p.m. on December 12, 1981, when he heard four gunshots. He looked out the window of his apartment, which overlooks an alley adjoining the street where Joseph and Theresa were killed, and "directly below the window," he saw two young men running through the alley immediately after he heard the gunshots. Morris described one of the persons as "a little dark complected, kind of medium" in skin tone, about 5'8" tall, approximately 160 lbs., having an afro hairstyle, and wearing a "brown jacket," and described the second man as being 5'6" tall, weighing about 135 lbs., Latino, with a lighter complexion than the other man, black hair parted in the middle, wearing a black leather jacket, and carrying a gun in his right hand. Morris testified that he had an opportunity to observe the second man's face for a "couple seconds."

Prior to Morris's testimony at trial, the defense, at a sidebar conference, made a motion *in limine* to preclude Morris from making an in-court identification of Rodriguez on the ground that it would be unduly suggestive because Morris had previously observed a picture with five Latino men in it, including the defendant,[7] and Rodriguez

5. There is no indication in the record that the police specifically asked her if Rodriguez was the murderer.

6. Officer John McKenna testified that he showed Santana the Kool Gang photos because the murders occurred on the "Kool Gang's turf."

7. Morris was never asked to identify Rodriguez before trial, but during cross-examination, Morris revealed that three weeks before the trial, he inadvertently saw a photograph of five Latino

men resting on a desk in the State's Attorney's office. Morris testified that when he saw the picture of the five young men, he recognized, and was sure, in his own mind, that one of the young men in the photo was the young Latino man, who was about 5'6" tall, 135 lbs., with black hair parted in the middle, wearing a black leather jacket, and carrying a gun, he saw running from the scene of the murders. He further testified that he never informed anyone that he saw this photo on the desk or that he recognized one of the individuals in the photograph.

would be seated at the defense table while such identification was being made. The government responded that it intended to have Morris identify the defendant from a photograph of five young Latino men in a lineup and advised the court that Morris had made no previous formal identification of the defendant before the trial. The court, over the objection of defense counsel, allowed the in-court photographic identification.[8] When Morris was shown the photo of the five young Latino men, he immediately identified Rodriguez as the person he saw in the alley, running with a gun in hand.

Margaret Anderson, the victims' mother, testified that at about 5:45 p.m. on December 12, 1981, she heard gunshots and went downstairs to discover her daughter, laying bleeding and motionless on the sidewalk in front of their house, and her son Joseph was also lying on the sidewalk in a pool of blood but still conscious. When she asked him who shot him, Joseph responded that he did not know.

Robert Beseth, a private investigator retained by the defense, testified that on December 19, 1981, he interviewed the fifteen year old Theresa Santana at her home, out of the presence of her parents or any relatives, and claimed that she stated that she did not identify Rodriguez as the murderer the first time she was shown a picture of him. Beseth stated that Santana told him she did not immediately identify Rodriguez because "she wasn't positive that was Joe in the photographs, the hair she said was different [longer and unshaved] ... she's familiar with Joe having ... puffy bags under his eyes [and] ... she did not see them," and that she was afraid of retaliation from the Kool Gang. Investigator Beseth testified that he wrote out a report of the interview immediately after he spoke with Santana, had it typed up and two days later, he returned to Santana's house, and asked her to sign the report. Beseth testified that although she read the report, she declined to sign it, stating that

the police and her mother told her not to sign anything.

On cross-examination, Santana admitted speaking with Beseth, but denied ever explaining to Beseth why she did not identify Rodriguez. She testified that she told Beseth that sometimes Rodriguez had "puffs" under his eyes, and that he had his head shaved before the murders, but denied telling Beseth that these were reasons why she did not identify Rodriguez for the police. She stated that the only reason she gave Beseth for not identifying Rodriguez was her fear of retaliation. Santana denied that either the police or her mother told her not to communicate with anyone from the defense about the case and furthermore, she denied that she ever made such a statement to Beseth. Finally, during re-direct examination, Santana testified that although she observed Beseth writing, presumably taking notes of his meeting with her, she contradicted him, stating that he never showed the notes to her nor did he read them to her, nor did he return to her apartment to present her with a copy of any written or typed statement to sign, much less was she given an opportunity to review them, at any time.

After the jury had heard the closing arguments and the court's instructions, it returned verdicts of guilty on the two murder counts and the trial judge accepted them, entered judgments of guilty on the verdicts, and sentenced Rodriguez to a single sentence of life imprisonment for both murders without parole in conformity with Ill.Rev.Stat. 1981, ch. 38, par. 1005–8–1(a)(1)(c). The defendant appealed and the Illinois appellate court affirmed his conviction and sentence. After Rodriguez filed petitions for Leave to Appeal to the Supreme Court of Illinois, and for a Writ of Certiorari to the United States Supreme Court which were denied, he filed a petition for a Writ of Habeas Corpus in the United States District Court which was also denied. He appeals.

8. After Morris had completed his testimony, the defense moved for a mistrial based on the suggestive nature of the in-court identification procedure. The judge denied the motion based on the fact that the defendant was seated at the defense table stating, "[h]ow can that be sugges-

tive when it's done before the jury and the jury can weigh their own conclusion to whether it was suggestive? ... Your motion will be denied at this time because I do not think of any better identification...."

## II. ISSUES

Rodriguez argues that: (1) his right to due process was violated by Morris's in-court identification; (2) he was denied due process because of the following remarks made by the two prosecutors during their closing and rebuttal arguments:

(a) the prosecutors violated an *in limine* order when they informed the jury that Santana was in a witness relocation program; (b) defense counsel was called a "liar" because of certain remarks he made during his closing arguments; (c) the prosecutor's comment that he "didn't know what the defense is" amounted to an impermissible comment on Rodriguez's failure to testify; (d) the prosecutor misstated the law of accomplice liability in Illinois in order to bolster Hernandez's credibility before the jury; (e) the prosecutor improperly vouched for the credibility of Morris and Santana; (f) victim impact statements were made which improperly evoked sympathy from the jury; and (g) the prosecutor speculated that if Rodriguez was acquitted, he would commit further murders; and (3) the mandatory natural life sentence imposed on him, a juvenile offender tried as an adult, violated his due process rights because the State of Illinois meant to exempt juveniles from life sentences, and the sentence imposed violated his Eighth Amendment right to be free from cruel and unusual punishment because he was not allowed to present mitigating evidence at his sentencing hearing.

## III. DISCUSSION

 "A prisoner is entitled to a writ of habeas corpus if he is being held under a state court judgment obtained in violation of the Constitution." 28 U.S.C. § 2254; *see also Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1370 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995). When considering a district court's decision to grant or deny a petition for a writ of habeas corpus, we review questions of law *de novo*, but "[f]actual issues that have been decided by the state trial or appellate courts are presumptively correct." *Montgomery v. Greer*, 956 F.2d 677, 680 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992) (citing 28 U.S.C. § 2254(d)). "The constitutionality of an identification procedure is a mixed question of law and fact that is not governed by the statutory presumption of section 2254(d)." *Id.* (citing *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982)).

> In deciding this question, [of the constitutionality of an identification procedure], the federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard [used to determine the constitutionality of the identification]. But the questions of fact that underlie this ultimate conclusion *are* governed by the statutory presumption.... Thus, whether the witnesses ... had an opportunity to observe the crime or were too distracted; whether the witnesses gave a detailed, accurate description; and whether the witnesses were under pressure ... are all questions of fact as to which the statutory presumption applies.

*Id.* (emphasis in original).

## A. IDENTIFICATION

Rodriguez argues that his due process rights were violated when Morris identified him in-court from a photograph of a lineup of five young, male Latinos, while he (Rodriguez) was sitting at the defense table, and after Morris had previously inadvertently seen this same lineup photograph on a desk in the State's Attorney's office.[9] The defendant argues that this identification procedure was unduly suggestive. Rodriguez also argues that he was denied due process when the prosecutor failed to disclose that Morris had, in fact, seen Rodriguez in the lineup photograph used at trial in the State's Attorney's office three weeks prior to the trial.

During cross-examination, Morris testified that when he was in the State's Attorneys' office three weeks prior to trial, he inadvertently in passing through the office did see a

---

**9.** *See, supra,* n. 7.

copy of a photograph of five Latino young men resting on the desk of one of the prosecutors. He observed the photo on the desk and, in his own mind, identified one of the young men in the lineup as the person he saw running through the alley with a gun in his hand the evening of December 12, 1981, immediately after having heard the gun shots. Morris further stated that he told no one, much less anyone in the State's Attorney's office, that he saw and recognized one of the young men in the photograph as being the person with a gun in hand running through the alley. Rodriguez attempts to rely on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) in support of his argument that he was denied due process because the state failed to notify him that Morris viewed a photograph of the lineup in the State's Attorney's office three weeks prior to trial. Because Morris never advised anyone in the State's Attorney's office that he saw the photograph, the prosecutor could not be expected to tell the defense that Morris had inadvertently seen the photograph for he had no such knowledge to convey to the defendant.

■ Furthermore, the defendant Rodriguez failed to raise the issue of the pre-trial identification in the state appellate proceedings, *Rodriguez,* 134 Ill.App.3d 582, 89 Ill. Dec. 404, 480 N.E.2d 1147, and thus it is waived and will only be reviewed in "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *McCleskey v. Zant,* 499 U.S. 467, 494, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). We require habeas petitioners to bring their claims in state court because "state courts must have a fair opportunity to consider the petitioner's constitutional claims before the federal courts may address those claims." *Jones v. Washington,* 15 F.3d 671, 674 (7th Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 2753, 129 L.Ed.2d 870 (1994) (citations omitted).

Before considering the merits of a petition for habeas corpus, a federal court must ensure that the petitioner has overcome two procedural hurdles: exhaustion and procedural default. Failure to exhaust all state remedies bars consideration of the petition. Failure to raise all claims during the course of the state court proceedings bars consideration of those claims not raised.

*Id.* (citations omitted); *see also Wainwright v. Sykes,* 433 U.S. 72, 89, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). "Failure to 'fairly present' . . . federal [constitutional] claims to the state courts will result in procedural default of those claims unless the petitioner can show cause and prejudice," and Rodriguez has failed to do so. *Jones,* 15 F.3d at 675; *see also U.S. ex rel. Simmons v. Gramley,* 915 F.2d 1128, 1136 (7th Cir.1990) ("a defendant may not raise on collateral attack even constitutional claims that could have been raised on appeal unless the defendant establishes 'cause and prejudice' for his omission"). Rodriguez has not afforded the Illinois state courts "any opportunity, much less a 'fair opportunity,' to consider the claim." *Id.*

■ Rodriguez has failed to offer an explanation for his failure to present the pre-trial identification issue to the state court either in his brief or during oral argument. In fact, when his counsel was questioned during his appellate oral argument about the failure to raise this issue in the State appellate proceedings, Rodriguez's attorney acknowledged that the issue of Morris's viewing the lineup photograph before the trial was not raised on appeal in Illinois, without any explanation. Thus, based on the record, we conclude that Rodriguez has failed to demonstrate "cause" for not bringing this issue to the attention of the Illinois court and, as we discuss *infra,* this case does not present an "extraordinary instance" in which a "constitutional violation probably has caused the conviction of one innocent of the crime," *McCleskey,* 499 U.S. at 494, 111 S.Ct. at 1470; "therefore, the claim concerning the pre-trial viewing of the photograph is procedurally defaulted and is barred from federal review." *Id.*[10]

---

10. We also note that even if Rodriguez had convinced us that "cause and prejudice" did exist, we would still refuse to grant relief based on the alleged *Brady* violation. *Brady* mandates that the prosecution present the defendant with all the *exculpatory* evidence in its possession, upon

Rodriguez's next contention is that Morris's in-court identification violated his right to due process because it was unduly suggestive in that he (Rodriguez) was seated at the defense table, and because Morris previously had an opportunity to view the lineup photograph on the desk in the State's Attorney's office. The admissibility of a challenged in-court identification is subject to a two part test. Initially, we must decide if the identification procedure was unduly suggestive. *United States v. Rutledge,* 40 F.3d 879, 889 (7th Cir.1994), *cert. granted,* —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (citing *Manson v. Brathwaite,* 432 U.S. 98, 107–14, 97 S.Ct. 2243, 2249–53, 53 L.Ed.2d 140 (1977)). If the threshold determination that an identification was suggestive is made, we then examine whether the identification was "so reliable, in view of the totality of the circumstances, as to prevent a substantial likelihood of misidentification." *Id.; see also United States v. Larkin,* 978 F.2d 964, 970 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993).

Both the Illinois appellate court and the district court held that the in-court identification procedure was suggestive; but on the other hand, both courts agreed that the degree of suggestiveness did not rise to the level of a due process violation because there was no "substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972) (quotation omitted). The Illinois appellate court stated that a defendant is not denied due process "when a witness identifie[s] him for the first time at trial when he was seated at the counsel table," if there is "an independent basis for the identification." *Rodriguez,* 89 Ill.Dec. at 408, 480 N.E.2d at 1151.

> [A]n in-court identification of itself does not deprive a defendant of due process. Similarly, this court has repeatedly held that a defendant has no absolute right to avoid identification at trial, suggestive cir-

cumstances notwithstanding. In our view, suggestiveness at trial, absent the taint of extra-judicial suggestiveness, does not offend due process because the trial itself affords the defendant adequate protection. The defendant receives the full benefit of a trial by jury, under the guidance of an impartial judge, with representation by counsel and witnesses subject to oath and cross-examination. We stress cross-examination, "the greatest legal engine ever invented for the discovery of truth." (V J. Wigmore, Evidence § 1367 (Chadbourne rev. 1974)). Where a witness first identifies the defendant at trial, defense counsel may test the perceptions, memory and bias of the witness, contemporaneously exposing weaknesses and adding perspective in order to lessen the hazards of undue weight or mistake. We emphasize, too, that the jury is capable of observing and weighing the suggestiveness of an in-court identification, if that identification is unaffected by extra-judicial suggestiveness. (See IV J. Wigmore, Evidence § 1130 (Chadbourne rev. 1972)).

*Id.* (citations omitted).

We also wish to note that this court has previously held that if the mere fact that the defendant is seated at the defense table while an in-court identification is made is "[t]he only suggestive circumstance identified by defendant," then this "circumstance alone is not enough to establish a violation of due process." *United States v. Bush,* 749 F.2d 1227, 1232 (7th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1771, 84 L.Ed.2d 831 (1985); *accord U.S. ex rel. Haywood v. O'Leary,* 827 F.2d 52, 59 (7th Cir.1987) (the fact that the defendant, the only black man in the court room, was seated at the defense table during an in-court identification, was not violative of due process because there was sufficient indicia that the identification was reliable); *see also Love v. Young,* 781 F.2d 1307, 1311 (7th Cir.), *cert. denied,* 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986).

request from the defendant. 373 U.S. at 87–88, 83 S.Ct. at 1196–97. Because the witness's identification of Rodriguez was *inculpatory* evidence in that it was further evidence of the defendant's guilt, it is not covered by *Brady. See also Jones,*

15 F.3d at 676 ("A successful *Brady* claim requires that the petitioner show that *favorable* evidence was suppressed by the prosecution and that the evidence was material to guilt or punishment.") (emphasis added).

■ Factual findings made in the state courts which underlie the determination of the reliability of in-court identifications, as with factual findings in habeas cases, are considered to be "presumptively correct" in the federal courts, 28 U.S.C. § 2254(d); *Greer*, 956 F.2d at 680, and are evaluated in light of the following factors:

(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the time of the confrontation, and (5) the length of time between the crime and the confrontation.

*Greer*, 956 F.2d at 680–81 (quotations omitted).

■ The Illinois appellate court found that the following facts, when considered in their totality, supported the reliability of Morris's in-court identification, and as is mandated by 28 U.S.C. § 2254(d), we agree with and defer to their findings:

Morris saw the face of the person who carried the gun for only a couple of seconds, but he testified that his attention was drawn by the gunshots. He described two men to the police that evening, and the descriptions fit defendant and Hernandez. He positively identified defendant in court nine months later.... At trial, Morris identified defendant from a photograph of a lineup, and after asking defendant to remove his eyeglasses, identified him at counsel table. Defense counsel cross-examined Morris concerning lapse of time since the shooting, and commented in closing argument about the suggestiveness of the identification. Defendant was not deprived of a fair trial simply because the testimony was imperfect. Just as the jury could consider the imperfect testimony of Hernandez and Santana, we believe that the jury was entitled to hear Morris' testimony. We trust that the jury reached its verdict based on all of the evidence.

*Rodriguez*, 89 Ill.Dec. at 409, 480 N.E.2d at 1152. Furthermore, although Rodriguez questions the reliability of the in-court identification because there were nine months between the murders and Morris's identification at trial, in *Larkin* we approved an identification even though there were ten and twenty-six month time lapses between witnessing a robbery and identifying the perpetrator holding that at the time of the robbery the witness had ample opportunity to view the robbers and was paying close attention. 978 F.2d at 970.

The jury, because of the overpowering quantum of evidence presented as to the defendant's guilt, as well as the prosecution and defense attorneys' thorough direct and cross-examination, was made fully cognizant of any and all possible deficiencies in Morris's identification, yet after weighing it and applying the evidence to the judge's instructions, they came to the conclusion that Joseph Rodriguez was the murderer of the Palmers. On the night of the murders, Morris provided a detailed description to the police of the person he saw running in the alley. Furthermore, the jury heard Santana, who was Rodriguez's schoolmate through grammar and high school, testify that she observed Rodriguez shoot Theresa and Joseph Palmer. Santana and Morris both stated under oath that the defendant was wearing a black leather jacket at the time of the Palmers' murders, and Santana, an eyewitness to the murders, corroborated Hernandez's (the defendant's co-conspirator) account of the double homicide in as much as to state that she heard and saw Rodriguez fire the one shot at Joseph's head, and three at Theresa's head, and then saw Rodriguez and Hernandez flee the murder scene in a red car.

After reviewing the record, we are convinced that based upon all the facts in the record, including Morris's specific and detailed description of the defendant immediately after the event, as well as his previously having seen Morris's picture on the desk in the State's Attorney's office and identified him in his own mind at that time, the in-court identification procedure could not have been prejudicially suggestive, and furthermore, there was no "likelihood of misidentification,"

*Rutledge,* 40 F.3d at 889. The defendant was not denied his right to due process.[11]

## B. PROSECUTORIAL MISCONDUCT

Rodriguez's second basis for appeal is that he was denied a fair trial because the prosecutor: 1) violated the trial court's *in limine* order by telling the jury that Santana was relocated after witnessing the murders; 2) called defense counsel a liar; 3) commented that he did not know "what the defense is" thereby commenting on his decision not to testify; 4) misstated the law of accountability when he stated that Hernandez was not guilty of murder in order to bolster Hernandez's credibility; 5) vouched for the credibility of Santana and Morris; 6) evoked sympathy for the victims and their mother; and 7) speculated on what Rodriguez would do if he were acquitted.

■ In order for his claim concerning the prosecutor's alleged misconduct to succeed, Rodriguez "must demonstrate that 'the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Reed,* 2 F.3d 1441, 1450 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 898, 127 L.Ed.2d 90 (1994) (quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)).

When analyzing allegations of prosecutorial misconduct during argument, we look at the disputed remarks in isolation to determine if they are proper. If the statements are proper, our analysis ends. If the statements are improper our second step is to look at the remarks in light of the entire record to determine if the defendants were deprived of a fair trial.

*Id.* "To carry this burden, [the defendant] must show that it is at least likely that the misconduct complained of affected the outcome of his trial—i.e., caused the jury to reach a verdict of guilty when otherwise it might have reached a verdict of not guilty." *United States ex rel. Shaw v. De Robertis,* 755 F.2d 1279, 1281, n. 1 (7th Cir.1985). This court considers five factors when weighing the prejudicial nature of a prosecutor's comments:

> (1) the nature and seriousness of the prosecutorial misconduct, (2) whether the prosecutor's statements were invited by conduct of defense counsel, (3) whether the trial court instructions to the jury were adequate, (4) whether the defense was able to counter the improper arguments through rebuttal, and (5) the weight of the evidence against the defendant.

*Reed,* 2 F.3d at 1450 (citations omitted).

These five factors are not applied in a rigid manner, but rather "carry varying weight depending on the facts of each case." *United States v. Badger,* 983 F.2d 1443, 1450 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993). "The most important factor to be considered in determining whether the closing statement violated [the defendant's] rights is ... the proof of ... guilt.... [S]trong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *United States v. Gonzalez,* 933 F.2d 417, 431–32 (7th Cir.1991).

### 1. *Relocated Witness*

■ During his closing argument, Assistant State's Attorney Timothy McMahon told the jury that it was understandable that Santana was reluctant to identify Rodriguez to the police because of her fear of retaliation, and remarked that "after the police and her mother and her relatives reassure her not to be afraid, you will be protected, she tells the

---

11. Rodriguez relies on *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977) and *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) to support his argument that the identification procedures used in this case violated his due process rights but the present case is readily distinguishable from both *Foster* and *Moore.* In *Foster,* when the witness identified the defendant in the first lineup, he said that he was not sure that he selected the correct person. Furthermore, the identification was made after the witness had seen a previous lineup and the defendant was the only person who participated in both lineups. 394 U.S. at 441–42, 89 S.Ct. at 1127–28. In *Moore,* the victim identified the defendant after she was told that she was going to view a suspect, after she was told his name, and after she heard him called as the suspect was led before the bench. Additionally, she heard the prosecutor describe the evidence he believed implicated the suspect. 434 U.S. at 322–23, 98 S.Ct. at 592–93.

police [defendant's name]." During the defense counsel's closing argument, he responded with a comment that the prosecutor's statement about Santana being afraid to testify was not supported by the evidence. In rebuttal, Assistant State's Attorney Brian Telander argued that Santana was so fearful that the State decided she should be relocated to another state. After Telander made this statement to the jury concerning her relocation, defense counsel promptly objected and the judge immediately advised the jury that the fact of Santana's relocation was "not the evidence" and that "where [Santana] is . . . now has nothing to do with the case, ladies and gentlemen of the jury." Rodriguez claims that his right to due process was violated when Telander violated the *in limine* order and informed the jury of Santana's relocation.

The Illinois appellate court found that the prosecutor's remarks were "improper, inflammatory and not based on evidence." *Rodriguez*, 89 Ill.Dec. at 410, 480 N.E.2d at 1153. However, the court continued by stating that "these comments were not a material factor in defendant's conviction" because "the evidence of defendant's guilt, considered, *in toto*, was overwhelming," and the trial judge "admonished the jury that the prosecutors [sic] comments were irrelevant and unsupported in the evidence." *Id.* Similarly, the federal district court found that the evidence of Rodriguez's guilt was "overwhelming," and although the "prosecutor's comments at trial were unprofessional, . . . those poorly chosen comments did not affect the outcome of the trial" because they bolstered Santana's credibility "only tangentially," and the trial judge "took the curative measure of admonishing the jury that the prosecutor's comments were irrelevant and unsupported by the record." *Rodriguez v. Peters*, No. 91 C 6563 (N.D.Ill. July 20, 1993).

We agree that the prosecutor's reply was ill-advised and improper in light of the trial judge's order, but it was far from inflammatory and does not rise to the level of preventing Rodriguez from receiving a fair trial; in fact, the problem probably would not have arisen if the defense counsel had not argued that the record did not support the prosecutor's comments that Santana was afraid of retaliation if she testified.[12]

As soon as Telander informed the jury that Santana was relocated, Rodriguez's attorney objected to the comment. When the judge overruled his objection, he nonetheless issued a contemporaneous limiting and clarifying instruction to the jury stating, "that's not the evidence," and that Santana's location at the time of the trial "has nothing to do with the case." Additionally, during the final jury instructions, after arguments, the judge informed the jury that:

> [c]losing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. *Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.*

(Emphasis added). "Jurors are presumed to follow . . . [all] instructions" from the court. *Doe v. Johnson*, 52 F.3d 1448, 1458 (7th Cir.1995) (quotation omitted); *see also United States v. Davis*, 15 F.3d 1393, 1402 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 250, 130 L.Ed.2d 171 (1994) ("We rely on our belief that juries heed the instructions").

Finally, it is clear that the weight of the evidence against Rodriguez was not only convincing, but it was overwhelming. *See, supra*, Section A. Such "strong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Gonzalez*, 933 F.2d at 431–32. We hold that the prosecutors' comments concerning Santana's relocation did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Reed*, 2 F.3d at 1450.

---

**12.** The prosecutor would have been well-advised to ask for a side-bar conference and request that the court withdraw its previous *in limine* order concerning the relocation, arguing that defense counsel opened the door when he stated that there was no evidence that Santana was afraid to identify Rodriguez and testify against him.

### 2. *Comments About Defense Counsel*

 Rodriguez's next contention is that the prosecutor called his attorney a liar and stated that the defense counsel's job was "to get his client off," thereby denying him a fair trial. During defense counsel's closing argument, he implied that one of the investigating police officers, Officer McKenna, acted improperly when investigating the Palmer murders because he failed to record a written memorandum of the fact that Santana was shown pictures of Rodriguez, but did not identify him. Rodriguez's attorney claimed that he only found out about Santana's failure to name the defendant in the early stages of the investigation because he retained a private investigator to speak with her. When Assistant State's Attorney Telander gave his rebuttal argument, he responded to the defense's accusation that the police engaged in misconduct when they did not memorialize Santana's failure to identify Rodriguez as the murderer during the initial stage of the investigation. Telander informed the jury that the prosecution turned over "every police report, every photo, everything we have" to the defense and stated that the defense counsel was "lying to you" when he said that he did not know that Santana did not identify Rodriguez right away, until after his private investigator, Beseth, spoke with her.

Although we do not reverse [Rodriguez's] conviction, neither do we approve of the prosecutor's conduct in closing argument. We strongly suggest that prosecuting attorneys thoroughly prepare their closing arguments before delivery and thus avoid such reckless and unsupportable comments and/or supposed legitimate inferences. The prosecutor's office is an entity [of the government] and as such it is the spokes[person] for the Government.... It is well understood in the realm of ethical and proper conduct of a criminal trial, that the prosecutor may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. Prosecutors must remember to live up to the code of professional ethics and fair play at all times or the American system of justice cannot endure, and ultimately our nation will lose confidence and trust in its rendering of justice, but, we refuse to reverse a conviction when we are convinced that the improper argument did not rise to the level of a constitutional violation of the defendant's rights.

*Gonzalez,* 933 F.2d at 432–33.

Thus, while we urge prosecutors, as officers of the court and representatives of the government, to use more temperate language when rebutting allegations of prosecutorial and/or police misconduct, we refuse to conclude that in the context of this case that the remarks had any prejudicial effect in light of the *Reed* factors. 2 F.3d at 1450 (the seriousness of the misconduct, invited response, adequate jury instructions, whether the defense counsel could rebut the statements, and the great weight of evidence against the defendant). The jury was presented with more than sufficient evidence of Rodriguez's guilt beyond a reasonable doubt, *see, supra,* Section A, and the judge explicitly instructed the jury that the attorneys' closing arguments were not evidence, that they were to base their verdict solely on the evidence received, not on the closing arguments, and that they should return a verdict of guilty only if they found "from [their] consideration of all the evidence that each one of [the elements of the crime of murder had] been proved beyond a reasonable doubt." In light of the overwhelming evidence of guilt and the instructions given, it is clear that Rodriguez was not prejudiced by the prosecutor's remarks about defense counsel "lying to you" concerning Santana's identification of Rodriguez.

 Rodriguez also contests statements made by State's Attorney McMahon in which he advised the jury of the responsibilities of the lawyers and the judge in the case. He told them that it was the State's responsibility to prosecute the case, and the defense counsel's responsibility "to try to get his client off." Rodriguez's attorney objected to the comment about his duty "to get his client off," and the court immediately ruled: "objection sustained as to that is his job." Furthermore, it is obvious that defense counsel

did rebut the objectionable comment in his closing argument, *Reed*, 2 F.3d at 1450, when he told the jury that his task was not to "get Rodriguez off," but rather to:

> prevent [the prosecution] or anyone else from just telling you that what Theresa, if Theresa Santana says it was Joey Rodriguez, that it's the gospel, it's etched in granite somewhere, it's not.
>
> *And what I say and what he says or they say is not evidence.* You know what the evidence is.

(Emphasis added).

We also note that the allegedly prejudicial comments concerning the defense counsel's duty did not involve a disputed issue in this case; namely, whether Santana, Morris and Hernandez credibly identified Rodriguez as the murderer. As we have previously held, "[i]f the prosecutor attacked defense counsel's truthfulness only as to an undisputed issue, then it is unlikely that the jury's decision was affected." *Pierson v. O'Leary*, 959 F.2d 1385, 1388 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 168, 121 L.Ed.2d 115 (1992). The allegedly offensive comment about the defense attorney's responsibilities in the trial related neither to a disputed nor a relevant issue, such as identification. Thus, it is most "unlikely that the jury's decision was affected" by the remark, *id.*, and we hold that Rodriguez suffered no prejudice from any of the State's Attorney's statements about defense counsel.

### 3. *Lack of a Defense*

 Rodriguez's next argument is that Telander improperly commented on his decision not to testify, in violation of his Fifth Amendment right to be free from self-incrimination, when he remarked to the jury, "What was the defense? The defense was the Defendant's investigator ... and a Chicago police officer would testify that he surrendered himself." When Telander made these statements, Rodriguez's attorney promptly said "objection." However, after his objection was properly overruled, he gave no specific reasons for his objection nor did he make an offer of proof as to why the objection should be sustained.

*The remarks of the prosecutor fall far short of a statement that could reasonably be considered as referring to Rodriguez's failure to testify.* We first note that the law is clear that an attorney, when making an objection, must "make a clear statement of the specific grounds for objection[s]." *O.K. Sand & Gravel v. Martin Marietta Technologies*, 36 F.3d 565, 568 (7th Cir.1994). "[G]eneral objections [at trial] do not preserve an issue for appellate review because they do not alert the court or [the] opposing party as to the specific grounds for the objections." *Doe*, 52 F.3d at 1457 (citation omitted); *cf., Prymer v. Ogden*, 29 F.3d 1208, 1214 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 665, 130 L.Ed.2d 599 (1994) (general objections to evidence do not preserve an issue for review). Thus, defense counsel has procedurally defaulted on this issue and we are "barred" from reviewing the propriety of this comment unless Rodriguez can meet the "cause and prejudice" test. *Jones*, 15 F.3d at 675; *see also Freeman v. Lane*, 962 F.2d 1252, 1256 (7th Cir.1992) (citing *Sykes*, 433 U.S. at 89, 97 S.Ct. at 2507–08).

Rodriguez's counsel has offered no explanation for his failure to make a specific objection and "we refuse to search and comb the record in search of" an explanation for the defendant's "cause" for waiving this issue on direct review. *United States v. Adamo*, 882 F.2d 1218, 1230 (7th Cir.1989) (citation omitted); *see also United States v. Brown*, 899 F.2d 677, 679 (7th Cir.1990) ("it is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel").

The right against self-incrimination is violated only when "1) it was the prosecutor's manifest intention to refer to the defendant's silence, or 2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." *United States v. Donovan*, 24 F.3d 908, 916 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994); *see also United States v. Tipton*, 964 F.2d 650, 657 (7th Cir.1992); *United States v. DiCaro*, 852 F.2d 259, 263 (7th Cir.1988) (quotation omitted). In *DiCa-*

*ro,* we held that because "the essence of the defendant's theory was that the government's witnesses were not reliable, the prosecutor was entitled to 'imply that the failure of the defense to present available evidence (other than the defendant's testimony) in opposition to the government's witnesses supports a conclusion that the government's witnesses are reliable.'" *Id.* State's Attorney Telander merely commented on the less than compelling nature of the defense by pointing out that it consisted of the investigator's report of his conversation with Santana and that a police officer would have testified that Rodriguez surrendered himself.

■■■ The overwhelming evidence as to the guilt of Rodriguez, *see, supra,* Section A, and the judge's explicit instruction to the jury in this case that "[t]he fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict," are further proof that the jury would have no reason to interpret the prosecutor's statements, in the normal course of his argument, regarding the weakness of the defense as a comment on Rodriguez's failure to testify on his own behalf because "jurors are presumed to follow ... instructions." *Doe,* 52 F.3d at 1458; *see also Davis,* 15 F.3d at 1402 ("[w]e rely on our belief that juries heed the instructions"). Therefore, we hold that Rodriguez suffered no prejudice, nor did State's Attorney Telander engage in any misconduct, when he merely commented in passing on the sparse defense Rodriguez presented at trial.

### 4. *The Law of Accountability*

In defense counsel's closing argument, he argued to the jury that Hernandez's credibility was open to doubt because he too was involved in the murders, that his testimony was procured through a plea bargain, and as a result of his cooperation with the state, he was charged with and convicted of a lesser crime than murder. During his rebuttal, State's Attorney Telander responded to the attack on Hernandez's credibility and told the jury:

**13.** In *Wayte,* the Court goes on to state that: This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such fac-

TELANDER: I want to talk about Mr. Hernandez just for a minute. Now, you may not like Mr. Hernandez; I don't. It is my decision of what happened to Mr. Hernandez. If you don't like it, hold it against me. I would have liked Mr. Hernandez to be sitting with his buddy right there where he belongs, but you have heard all the evidence. Is Mr. Hernandez guilty of murder?

Did Theresa Santana say Mr. Hernandez shot anybody? She said it was another guy back there.

DEFENSE: Objection.

COURT: Overruled.

\* \* \* \* \* \*

TELANDER: No one says Hernandez killed anybody.

At the outset, as in criminal trials both state and federal, prosecutors have "the responsibility of evaluating evidence *and other pertinent factors* and determining what, if any, offense may be charged. The prosecutor is vested with *wide discretion* in enforcing the criminal laws." *People v. Williams,* 147 Ill.2d 173, 167 Ill.Dec. 853, 887, 588 N.E.2d 983, 1017 (1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 218, 121 L.Ed.2d 156 (1992) (emphasis added) (citing *People v. Rhodes,* 38 Ill.2d 389, 231 N.E.2d 400 (1967); *Marcisz v. Marcisz,* 65 Ill.2d 206, 2 Ill.Dec. 310, 357 N.E.2d 477 (1976)); *see also Jarrett v. United States,* 822 F.2d 1438, 1443 (7th Cir.1987) (quoting *Wayte v. United States,* 470 U.S. 598, 606, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985)) (noting that:

The government retains broad discretion in exercising its decision as to whom it prosecutes and when it decides to prosecute. So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his or her discretion).[13]

tors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall en-

Rodriguez argues that Telander misstated the law of accountability (accomplice liability) in Illinois in order to impermissibly bolster Hernandez's credibility in the eyes of the jury and that such a misstatement denied him his right to due process. The Criminal Code of Illinois at the time of Rodriguez's conviction provided that a person was legally accountable for the conduct of another person when: "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill.Rev.Stat.1977, ch. 38, par. 5–2(c), Principles of Criminal Liability, Parties to Crime, When Accountability Exists. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction as a principal for a crime committed by another in furtherance of the venture." *People v. Ruiz,* 94 Ill.2d 245, 68 Ill.Dec. 890, 893, 447 N.E.2d 148, 151 (1982), *cert. denied,* 462 U.S. 1112, 103 S.Ct. 2465, 77 L.Ed.2d 1341 (1983).

■ The Illinois appellate court found that Telander did "misstat[e] law in order to minimize the impact of the plea bargain with Hernandez." *Rodriguez,* 89 Ill.Dec. at 410, 480 N.E.2d at 1153. The court continued, however, and stated that "these comments were fleeting and oblique, and in view of the strength of the evidence, we do not believe that they affected the jury's deliberations." *Id.* The district court also concluded that "these poorly chosen comments did not affect the outcome of the trial" because of the "overwhelming" evidence of guilt, and the

comments bolstered Hernandez's credibility "only tangentially."

We agree with the appellate and district courts's comments and in light of the "entire record," Telander's statement about Hernandez's culpability did not influence the jury's verdict nor violate his right to due process of law. *Reed,* 2 F.3d at 1450. The evidence presented against Rodriguez established his guilt beyond a reasonable doubt, *see, supra,* Section A.

■ Furthermore, we refuse to second-guess the State's Attorney's exercise of discretion in deciding not to prosecute Hernandez for murder. A prosecutor is frequently put in the position of being forced to offer a plea bargain in order to obtain testimony which will aid the prosecution in the presentation of its case against the more culpable conspirator in a criminal act. The State of Illinois's main target in the prosecution was Rodriguez, the person who formulated the plan to murder the Palmers, ordered the gun be delivered to the scene, and fired the shots which ended Joseph and Theresa's lives.[14] Hernandez's testimony aided the State in its prosecution of Rodriguez and in our opinion, and even though we might not have offered the plea had we been the prosecutor, it was a proper exercise of prosecutorial discretion to offer a plea bargain to a lesser charge.

### 5. Vouching for the Credibility of Prosecution Witnesses

Rodriguez's next assignment of error is that the State's Attorney Telander improperly vouched for Morris's and Santana's credibility. During defense counsel's closing argument, he stated that Santana's "identification [of Rodriguez] stinks," and that Morris's

---

forcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.... Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

470 U.S. at 607, 105 S.Ct. at 1530.

**14.** Further, we note that there is no indication in the record that Hernandez had any prior criminal record, although we agree with the defense

counsel's comment that there was sufficient evidence of Hernandez's culpability for the State to prosecute him for murder. However,

the defendant might prefer a rule requiring all government witnesses to be pillars of their communities, ... [but] in this imperfect world, a litigant must often take the witness as he or she is, imperfections and all. We cannot expect that witnesses will possess the credibility of people of the cloth, such as rabbis, [ministers], priests, and nuns.

*United States v. Rose,* 12 F.3d 1414, 1425 (7th Cir.1994).

identification was also less than credible because of the suggestive nature in which it was procured. Telander responded with the following statements:

> Now, either Theresa Santana is correct or she's lying.... Now what motive would Theresa Santana have to try to put a double murder on one of her friends? ... Is she a liar? ... If you believe that she's a liar, then this is a frame and you've got to believe that he is guilty, framed for a double murder.
>
> \* \* \* \* \* \*
>
> You've also got to believe the State's Attorney's Office, he doesn't want to say it, but you have to believe it that we are in on it, that the police are in on it, that we made Danny Morris come in here and he didn't want to identify him;
>
> \* \* \* \* \* \*
>
> You can't decide the case on police reports, you got to decide the case on what's right and what's wrong, and when you think of that, think of Danny Morris. Think of what does he have to gain? Think of Theresa Santana, what does she have to gain?
>
> They both have everything to lose. Danny Morris lives in that house today right in the center of the Kool Gang territory. He's back there right now waiting for you to decide. Are you going to send him back out, he's going to come home tonight, thanks, Dan, we appreciate it.

■ In order to preserve a question for review in the Illinois courts, both a trial objection and a written post-trial motion about the claim are required. Ill.Ann.Stat. ch. 38, para. 116–1. Because defense counsel failed to object to these comments at trial, the issue of whether the prosecutor prejudicially vouched for the credibility of the witnesses was procedurally defaulted, not properly preserved for review, and we refuse to review this issue absent a show of "cause and prejudice." *Jones,* 15 F.3d at 674. The State of Illinois has not had "a fair opportunity to consider the petitioner's constitutional claims before the federal courts may address those claims," *id.* (citations omitted), and was not afforded an opportunity to correct the perceived errors.

■ We note that Rodriguez has failed to offer any explanation for his failure to object to these remarks at trial, and therefore, has not demonstrated "cause" for the procedural default and we are "barred" from reviewing this issue. *Jones,* 15 F.3d at 675. Further, although it "is never proper for any attorney to vouch for the truthfulness of a witness's testimony because the determination of credibility is a task left exclusively to the jury," *Davis,* 15 F.3d at 1401, the law does allow the prosecution to comment on the credibility of a witness within certain limitations: "the government is allowed to comment on the credibility of a witness ... as long as the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion." *United States v. Goodapple,* 958 F.2d 1402, 1410 (7th Cir.1992). As Telander stated, Santana had nothing to gain by testifying against Rodriguez, except performing her duty as a good law abiding citizen, for she feared retaliation, but with encouragement from her family and the government, she agreed to testify against the defendant in spite of her fear. Thus, "[t]he prosecutor's remarks merely related to the inferences to be drawn from the evidence." *Tipton,* 964 F.2d at 656.

Additionally, in order to preserve the integrity of the jury process, the court carefully instructed the jury that:

> You are the sole judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have, that the reasonableness of his testimony in light of all the evidence in this case.

In *Davis,* this court held that jury "instructions effectively address[ ] the risk the vouching presented and sufficiently dispelled any prejudicial effect the vouching may have had. We rely on our belief that juries heed the instructions." 15 F.3d at 1402 (quotation omitted). In the case at hand, we believe that the jury was properly instructed not

only that closing arguments were not evidence for them to consider in reaching a verdict, but they were also clearly informed that they were the sole arbiters of credibility of the witnesses. We hold that Rodriguez suffered no prejudice from the prosecutor's remarks for the evidence of Rodriguez's guilt was staggering, *see, supra*, Section A, and the jury was properly instructed. *Reed*, 2 F.3d at 1450.

### 6. *Evoking Sympathy*

Rodriguez argues that State's Attorney Telander made improper "victim impact" statements, *i.e.*, statements about how the murders affected the Palmer family, most particularly their mother, and remarks about the nature of the crime, which prejudiced his right to a fair trial.

Because defense counsel failed to object to these comments at trial, the issue of whether the prosecutor prejudicially evoked sympathy from the jury was waived for our review, Ill.Ann.Stat. ch. 38, para. 116–1, and we refuse to review this issue absent a show of "cause and prejudice." *Jones*, 15 F.3d at 674. Further, we note that Rodriguez has failed to offer any explanation whatsoever for his failure to object to these remarks at trial.

In spite of Rodriguez's waiver of this issue, we will summarily dispose of the prejudice prong of the analysis as well. The allegedly objectionable statements are the following:

You know, did he ask Theresa or Joe, "Would you like to live maybe a few more years?"

Did he ask them, you know, "Would you like someday to grow up and to marry and to fall in love and have kids?"

Did he think about that when he did it? Did he say, "Well, maybe you'd like to have, you know, a few more moments of your life. Kiss you mother goodbye, say goodbye to your brother."

Did he care? Don't forget, don't let the crime get lost in the garbage on the side. You can't forget and don't forget what he did to that woman.

Three people died that night, and you know it. Her life is over, his mother's life is over. She will never be the same again. It is over. She will carry this her whole life, and he did it and I want you to be angry with him because you should be.

\* \* \* \* \* \*

This case, ladies and gentlemen, is the worse [sic] crime I have ever seen as a prosecutor.

 The Illinois appellate court stated that these comments were "inflammatory and improper," but that "it is likely that the jury was outraged by the nature of the crime and sympathetic to the victims and their mother long before any of the closing arguments." *Rodriguez*, 89 Ill.Dec. at 413, 480 N.E.2d at 1156. The court further noted that "[t]he jury was instructed to decide the case based on the evidence, and not on the basis of counsel's arguments or their individual sympathies. We trust that the jury followed instructions, and we adhere to our opinion that improper comments were not a material factor in defendant's conviction." *Id.*

Indeed, as we noted in *Pierson*, "[e]very criminal case involving a victim will create some sympathy. In this case, there was substantial evidence strongly tending to prove murder and the victim impact [argument] constituted a relatively small part of the total [argument]." 959 F.2d at 1391 (prosecutor's remarks which were one and one-half pages out of a twenty-seven page closing argument were not so great as to render the trial fundamentally unfair). In this case, the "victim impact" statements constituted but one page out of thirty-five pages of the closing argument transcript, an even smaller ratio than the one we held was harmless in *Pierson*. Additionally, when the jury is instructed that sympathy should not influence its verdict, the chance of error is further reduced, *Id.* at 1390–91, and the trial judge specifically stated to the jurors that "[n]either sympathy nor prejudice should influence you."

With respect to Rodriguez's protestations that the prosecutors improperly commented on the vicious nature of the crime, "as a general rule, the prosecutor may comment on the evils of crime." *Williams*, 171 Ill.Dec. at 161, 593 N.E.2d at 981 (citations omitted). When "the evidence at trial indeed revealed

the offenses to be horrific and defendant never took issue with such evidence, choosing instead to contest the issue of identification," *Williams,* 167 Ill.Dec. at 875, 588 N.E.2d at 1005, there is no prejudicial error. Rodriguez never took issue with the prosecutor's remarks about the nature of the crime, and in fact, his own attorney stated during his closing argument that "[w]hat happened to these two kids is the most brutal, disgusting, senseless, ugly crime that was ever committed." As the Illinois appellate court concluded, "[w]e do not condone the prosecutor injecting his personal assessment or professional judgment of the severity of a crime into the trial, but we think it is unrealistic to hold the prosecutor to a standard of sterile analysis in response to defense counsel's touching show of humanity." *Rodriguez,* 89 Ill.Dec. at 413, 480 N.E.2d at 1156. From our review of the record, we are of the opinion that the "victim impact" statements fall far short of demonstrating any prejudice toward Rodriguez, and thus, he was not denied his right to due process.

### 7. *Speculation About the Defendant's Actions*

Rodriguez's final allegation of prosecutorial misconduct is that Telander made the following speculative and inflammatory remarks about what the defendant would do if acquitted:

> Today is the day it catches up to him for creeping around the gangways and the alleys of our city with a gun, for stalking his victims, for killing two innocent people indiscriminately without mercy, without concern, whether it's a girl or a boy, a young man or an old man, and then for scurrying off into the night to do it again.

As we noted above, in Illinois, a trial objection is necessary to preserve an issue for review, Ill.Ann.Stat. ch. 38, para. 116–1, but Rodriguez's counsel made no such objection to these comments. Thus, the issue of whether these comments were prejudicially inflammatory has been procedurally defaulted unless Rodriguez can demonstrate "cause and prejudice" for his waiver. *Jones,* 15 F.3d at 674. His attorney had not even acknowledged the failure to preserve this issue, let alone offer an explanation for why it was waived. Thus, we are barred from reviewing this claim as a basis for habeas relief. *Id.*

Furthermore, Rodriguez also fails the prejudice test. The Illinois court held that "this comment was aimed at defendant's conduct at the time of the crime, and did not amount to a prediction of the consequence of an acquittal." *Rodriguez,* 89 Ill.Dec. at 413, 480 N.E.2d at 1156. This comment, however, like others made by the prosecutors during their closing and rebuttal arguments, was somewhat inflammatory, and we urge restraint in the future so that the "American system of justice can[ ] endure" without our "nation [losing] confidence and trust in its rendering of justice[.]" *Gonzalez,* 933 F.2d at 433. "The government may not attempt to obtain a conviction by appealing to jurors to prevent future crimes by finding present guilt." *United States v. Cunningham,* 54 F.3d 295, 300 (7th Cir.1995) (citation omitted). "But while we agree with the defendant that the prosecution acted improperly [by speculating on the defendant's future conduct if acquitted], we must further determine if prejudice to the defendant resulted." *Id.* at 301. We look "at the remarks in light of the entire record to determine if the defendant [was] deprived of a fair trial." *Reed,* 2 F.3d at 1450.

We stress, once again, that the jury was properly instructed not to consider the closing arguments as evidence, in arriving at their verdict, *Doe,* 52 F.3d at 1548 ("Jurors are presumed to follow limiting instructions"); *Davis,* 15 F.3d at 1402 ("We rely on our belief that juries heed the instructions"), and the evidence against Rodriguez was overwhelming. *See, supra,* Section A. Thus, the defendant was not denied due process and his right to a fair trial was not prejudiced by the prosecutor's passing remark "scurrying off into the night to do it again."

## C. SENTENCING

Rodriguez's final argument is that his natural life sentence without possibility of parole violates the Eighth Amendment's prohibition against "cruel and unusual punish-

ment." Because the Illinois statute mandates a natural life sentence for those convicted of more than one murder, a sentencing court has no discretion but to impose such a sentence. Thus, any mitigating evidence in support of a reduced sentence would be of no value. He also argues that because the Illinois state legislature exempted minors from eligibility for the death penalty, it could not have rationally intended for minors to be sentenced to natural life sentences which have "the same irrevocable quality as a death sentence," and thus, his right to due process was violated because he was only fifteen years of age at the time he committed the dual murders.

Both of Rodriguez's contentions are premised on his mistaken belief that the death penalty and life in prison without the possibility of parole are qualitatively the same. This analogy is flawed. In *Harmelin v. Michigan,* 501 U.S. 957, 995, 111 S.Ct. 2680, 2702, 115 L.Ed.2d 836 (1991), the Supreme Court stated that:

> the penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. As it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

(quoting *Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring)).

It is precisely because the death penalty as applied is so "unique in its total irrevocability" in our system of criminal justice that sentencing courts are required to consider mitigating factors when imposing the death penalty; however, a court is not required to, and in Illinois is not permitted to, consider mitigating circumstances when imposing a natural life sentence because of the "qualitative difference between death and all other penalties." *Harmelin,* 501 U.S. at 995, 111 S.Ct. at 2702 (citations omitted); *see also Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980) ("Because a sentence of death differs in kind from any sentence of imprisonment, *no mat-*

*ter how long,* our decisions applying the prohibition of cruel and unusual punishments to capital cases are of limited assistance in deciding the constitutionality" of non-capital punishment) (emphasis added). Thus, we reject Rodriguez's argument that his sentence was "cruel and unusual" because he was not permitted to present mitigating evidence before he was sentenced to natural life in prison.

Rodriguez also argues that the Illinois legislature could not have exempted minors from the death penalty yet intended to sentence them to natural life sentences. Once again, he premises this argument on his flawed analogy between the death penalty and a natural life sentence. In *Harmelin,* Justice Kennedy, in a concurring opinion, made it clear that the determination of criminal penalties is one that should be left to the states. He commented that the Court's "decisions recognize that the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle," 501 U.S. at 997, 111 S.Ct. at 2702, and that there are "some common principles that give content to the uses and limits of proportionality review." *Id.* at 998, 111 S.Ct. at 2703.

> The first of these principles is that the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts.... The efficacy of any sentencing system cannot be assessed absent agreement on the purposes and objectives of the penal system. And the responsibility for making these fundamental choices and implementing them lies with the legislature.... Thus, reviewing courts ... should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes.... The function of the legislature is primary, its exercises fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety.... Our federal system recognizes the independent

power of a State to articulate societal norms through criminal law.

*Id.* at 998–99, 111 S.Ct. at 2703–04.

The Illinois courts have previously held that the natural life statute is constitutional even when applied to fifteen year old juveniles because "the fact that the defendant was fifteen years old at the time that he committed the two murders is irrelevant." *People v. Wages,* 261 Ill.App.3d 576, 199 Ill. Dec. 59, 68–69, 633 N.E.2d 855, 864–65 (1 Dist.), *appeal denied,* 157 Ill.2d 519, 205 Ill. Dec. 182, 642 N.E.2d 1299 (1994); *People v. Taylor,* 102 Ill.2d 201, 80 Ill.Dec. 76, 464 N.E.2d 1059 (1984). In so holding, the courts have stated that "[t]he legislature has the power to declare and define conduct constituting a crime and to determine the nature and extent of punishment for it. Such legislation will not be nullified by courts unless it violates a constitutionally assured right." *Wages,* 199 Ill.Dec. at 68, 633 N.E.2d at 864; *see also Taylor,* 80 Ill.Dec. at 79, 464 N.E.2d at 1062 (the goal of rehabilitation of criminals should not and does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders. It is within the legislative province to define offenses and determine the penalties required to protect the interests of our society.)

 The legislative determination that juvenile offenders who are found guilty of having committed more than one murder and are tried as adults should not be subjected to the death penalty does not imply that they cannot be sentenced to life in prison, especially when the statute in question contains no language whatsoever to suggest that an exemption from life in prison was contemplated for juvenile murderers tried as adults. We have often said that "the plain language of a statute is the most reliable indicator of Congressional intent," *Central States, et al. v. Cullum Companies,* 973 F.2d 1333, 1339 (7th Cir.1992), and we adhere to that view with respect to the Illinois State Legislature as well. Legislatures are presumed to have understood the laws they enacted, and thus would have exempted juveniles from natural life sentences if they saw fit to do so. *Oberg v. Allied Van Lines, Inc.,* 11 F.3d 679, 683 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says." *Id.* (quoting *Connecticut Nat'l. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992).

Rodriguez has provided us with no case law, statutory language, or legislative history, to suggest, much less mandate, that we conclude that the Illinois legislature intended to exempt juveniles from natural life sentences. Moreover, we live in a world where juvenile offenders are committing violent crimes with increasing frequency. It has often been said that a bullet fired from a gun of a juvenile, at the head of another, is just as fatal as one fired from a weapon of an adult. Society is overwhelmed and angry with the consequences of such violence and the Illinois state legislature took an affirmative step toward deterring violent juvenile offenders in its state; it provided for natural life sentences for all who are found guilty of committing more than one murder, including juvenile offenders, tried as adults. We refuse to substitute our judgment for that of the Illinois legislature.

 States are free to make their own determinations about punishment, subject only to the Eighth Amendment's requirement that they be based on objective factors. *Rummel,* 445 U.S. at 283, 100 S.Ct. at 1144. The State of Illinois has adopted legislation mandating that a person found guilty of committing two or more murders must be incarcerated for the rest of his or her natural life. This penalty is based on sufficiently objective criteria, *i.e.,* the commission of more than one murder, and it can be rationally applied to juvenile offenders who are tried as adults without offending the Eighth Amendment's prohibition against cruel and unusual punishment.

The district court is AFFIRMED.